**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MARK CUBAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 1:09-cv-00996 (RWB)** |
| **vs.** ) | **Judge Reggie B. Walton** |
| ) | |
| **SECURITIES AND EXCHANGE** ) | |
| **COMMISSION,** ) | |
| ) | |
| **Defendant.** ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT SECURITIES AND EXCHANGE COMMISSION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

DEWEY & LeBOEUF LLP
Lyle Roberts
David M. Ross
1101 New York Avenue, NW
Washington, D.C. 20005

i

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF MATERIAL FACTS  AS TO WHICH THERE IS NO GENUINE
ISSUE ......................................................................................................................6

ARGUMENT ...........................................................................................................6

I.      FOIA STANDARD OF REVIEW.....................................................................6

        A.      General FOIA Standard of Review........................................................6

        B.      Standards Governing *Vaughn* Indexes..................................................7

II.     THE SEC'S FOIA RESPONSE DID NOT NOTIFY PLAINTIFF OF APPEAL
        RIGHTS AS TO CATEGORIES FOR WHICH NO SEARCH WAS
        CONDUCTED..................................................................................................7

III.    SEC FAILS TO ESTABLISH THAT IT CONDUCTED AN ADEQUATE
        SEARCH FOR FOIA LETTER NOS. 7, 11, 12 and 13 ......................................9

IV.     THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS
        CLAIM FOR EXEMPTION 2.........................................................................13

        A.      Standards Governing Exemption 2 Claims...........................................13

        B.      The SEC's Declarations and *Vaughn* Index Fail to Substantiate the SEC's
                Reliance on Exemption 2 ...................................................................14

V.      THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS
        CLAIM FOR EXEMPTION 5.........................................................................15

        A.      Standards Governing Exemption 5 Claims...........................................15

        B.      The SEC's Declarations and *Vaughn* Index Do Not Adequately
                Substantiate the SEC's Reliance on Exemption 5 .................................15

                1.      Attorney-Client Privilege.........................................................15

                2.      Attorney Work Product............................................................18

                3.      Deliberative Process Privilege .................................................20

## TABLE OF CONTENTS
(continued)

Page

VI.   THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS
      CLAIM FOR EXEMPTION 6.......................................................................................22

      A.      Standards Governing Exemption 6 Claims...........................................................22

      B.      The SEC's Declarations and *Vaughn* Index Do Not Adequately
              Substantiate the SEC's Reliance on Exemption 6 .................................................23

VII.  THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS
      CLAIM FOR EXEMPTION 7(C) .....................................................................................26

      A.      Standards Governing Exemption 7(C) Claims .....................................................26

      B.      The SEC's *Vaughn* Index Does Not Adequately Substantiate the SEC's
              Reliance on Exemption 7(C)..................................................................................28

              (1)      Documents Nos. 9, 16, 17, and 18 ...............................................28

              (2)      Documents Nos. 78, 79 and 80.....................................................28

VIII. THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS
      CLAIM FOR EXEMPTION 7(A) .....................................................................................29

      A.      Standards Governing Exemption 7(A) Claims .....................................................30

      B.      Standards for Categorical Approach to Claims Under Exemption 7(A) ...............30

      C.      The Functional Categories Stated by the Riewe Declaration Are
              Inadequate ............................................................................................................32

IX.   THE SEC WAIVED ITS BLANKET EXEMPTION UNDER THE PRIVACY
      ACT BY FAILING TO COMPLY WITH ITS OWN REGULATIONS ..........................36

X.    THE SEC'S MOTION DOES NOT COMPLY WITH LOCAL CIVIL RULE 7
      AND SHOULD BE DENIED...........................................................................................38

CONCLUSION...................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguirre v. SEC,*
    551 F. Supp. 2d 33 (D.D.C. 2008) ...................................................................22, 23, 24, 26

*Arieff v. U.S. Dep't of the Navy,*
    712 F.2d 1462 (D.C. Cir. 1983) ...................................................................22, 24

*Aug v. National R.R. Passenger Corp.,*
    425 F. Supp. 946 (D.D.C. 1976) ...................................................................14

*Bevis v. Dep't of State,*
    801 F.2d 1386 (D.C. Cir. 1986) ...................................................................31, 32, 34

*Blazy v. Tenet,*
    194 F.3d 90 (D.C. Cir. 1999) ...................................................................37

*Brinton v. Dep't of State,*
    636 F.2d 600 (D.C. Cir. 1980) ...................................................................16

*Campbell v. Dep't of Health & Human Services,*
    682 F.2d 256 (D.C. Cir. 1982) ...................................................................31

*Canadian Javelin, Ltd. v. SEC,*
    501 F. Supp. 898 (D.D.C. 1980) ...................................................................16

*Carney v. U.S. Dep't of Justice,*
    19 F.3d 807 (2d Cir. 1994) ...................................................................6, 9, 10, 33

*Center For Nat. Sec. Studies v. U.S. Dep't of Justice,*
    215 F. Supp. 2d 94 (D.D.C. 2002) ...................................................................12

*Church of Scientology of Cal. v. IRS,*
    792 F.2d 146 (D.C. Cir. 1986) ...................................................................10

*Church of Scientology of Cal. v. U.S. Dep't of Army,*
    611 F.2d 738 (9th Cir. 1979) ...................................................................28

*Coastal States Gas Corp. v. Dep't of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) ...................................................................16

*Crooker v. Bureau of Alcohol, Tobacco, and Firearms,*
    789 F.2d 64 (D.C. Cir. 1986) ...................................................................32

*Curran v. Dep't of Justice,*
    813 F.2d 473 (1st Cir. 1987) ...................................................................30

*Darst v. Social Sec. Admin.*,
    172 F.3d 1065 (8th Cir. 1999) ........................................................36

*Davis v. U.S. Dep't of Justice*,
    460 F.3d 92 (D.C. Cir. 2006) ..........................................................11

*Dep't of Air Force v. Rose*,
    425 U.S. 352, 96 S. Ct. 1592. (1976) ................................6, 14, 24, 25

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1, 121 S. Ct. 1060 (2001) ..............................................15, 20

*Dinsio v. FBI*,
    445 F. Supp. 2d 305 (W.D.N.Y. 2006) ..............................................8, 9

*EPA v. Mink*,
    410 U.S. 73, 93 S. Ct. 827 (1973) ..............................................1, 20, 21

*Founding Church of Scientology of Wash., D.C., Inc. v. Na'l Sec. Agency*,
    610 F.2d 824 (D.C. Cir. 1979) ..........................................................9

*Garcia v. U.S. Dep't of Justice*,
    181 F. Supp. 2d 356 (S.D.N.Y. 2002) ..............................................10

*Gardels v. CIA*,
    637 F.2d 770 (D.C. Cir. 1980) ....................................................39, 40

*Goodrich Corp. v. U.S. EPA*,
    593 F. Supp. 2d 184 (D.D.C.2009) ....................................................35

*Guarino v. Brookfield Twp. Trustees*,
    980 F.2d 399 (6th Cir. 1992) ..........................................................39

*Hickman v. Taylor*,
    329 U.S. 495, 67 S. Ct. 385 (1947) ..................................................18

*Hill v. Dep't of Air Force*,
    844 F.2d 1407 (10th Cir. 1988) ......................................................38

*In re Dep't of Justice*,
    999 F.2d 1302 (8th Cir. 1993) ........................................................31

*Institute for Justice & Human Rights v. Executive Office of the U.S. Attorney*,
    No. C-96-1469, 1998 WL 164965 (N.D. Cal. March 18, 1998) ..............31

*Jackson v. Finnegan*,
    101 F.3d 145 (1996) ..................................................................39, 40

*Janicker v. George Washington University,
    94 F.R.D. 648 (D.D.C.1982)........................................................................18

Ladd v. Chemonics Int'l Inc.,
    603 F.Supp.2d 99 (D.D.C. 2009) ...............................................................40

Lawyers Committee for Civil Rights of San Francisco Bay Area v.
    U.S. Dep't of Treasury, 2009 WL 1299821 (N.D. Cal. May 11, 2009)................................31

Long v. U.S. Dep't of Justice,
    10 F. Supp. 2d 205 (N.D.N.Y. 1998) ...........................................................7

Manna v. Dep't of Justice,
    51 F.3d 1158 (3d Cir. 1995).....................................................................30

*Maynard v. CIA,
    986 F.2d 547 (1st Cir. 1993)..................................................................9, 10

*Mead Data Central, Inc. v. U.S. Dep't of Air Force,
    566 F.2d 242 (D.C. Cir. 1977) .............................................................15, 16, 17

Mo. Coal. for the Env't Found. v. U.S. Army Corps of Eng'rs,
    542 F.3d 1204 (8th Cir. 2008) ...................................................................20

*National Wildlife Fed'n v. U.S. Forest Serv.,
    861 F.2d 1114 (9th Cir. 1988) ..................................................................20

*NLRB v. Robbins Tire & Rubber Co.,
    437 U.S. 214, 98 S. Ct. 2311(1978).......................................................6, 30, 31

*NLRB v. Sears, Roebuck & Co.,
    421 U.S. 132, 95 S. Ct. 1504 (1975)........................................................15, 21

*Oglesby v. U.S. Dep't of Army,
    920 F.2d 57 (D.C. Cir. 1990) ..................................................................11

Owens v. U.S. Dep't of Justice,
    No. 04-1701 (JDB), 2006 WL 3490790 (D.D.C. Dec. 1, 2006).............................................32

Powell v. U.S. Bureau of Prisons,
    927 F.2d 1239 (D.C. Cir. 1991) ................................................................28

*Providence Journal Co. v. U.S. Dep't of the Army,
    981 F.2d 552 (1st Cir. 1992)...................................................................20

Rifskis v. Dep't of Hous. & Urban Dev.,
    746 F2d 1 (D.C. Cir. 1984) ....................................................................23

*Ruotolo v. Dep't of Justice, Tax Div.,*
  53 F.3d 4 (2nd Cir. 1995) ............................................................................7, 9

Rural Housing Alliance v. U.S. Dep't of Agriculture,
  498 F.2d 73 (D.C. Cir. 1974) .............................................................................27

*SafeCard Servs., Inc. v. SEC,*
  926 F.2d 1197 (D.C. Cir. 1991) .......................................................................9, 10

*Sameena, Inc. v. U.S. Air Force,*
  147 F.3d 1148 (9th Cir. 1998) ...........................................................................37

SEC v. Cuban
  No. 3:08-cv-02050-D (N.D. Tex.) .......................................................................5

Soucie v. David,
  448 F.2d 1067 (D.C. Cir. 1971) .........................................................................13

St. Andrews Park, Inc. v. U.S. Dep't of Army Corps of Eng'rs,
  299 F. Supp. 2d 1264 (S.D. Fla. 2003) ................................................................7

*Stern v. FBI,*
  737 F.2d 84 (D.C. Cir. 1984) .......................................................................27, 28

Stokes v. Brennan,
  476 F.2d 699 (5th Cir. 1973) .............................................................................14

Trans-Pacific Policing Agreement v. U.S. Customs Serv.,
  177 F.3d 1022 (D.C. Cir. 1999) .........................................................................28

Triestman v. U.S. Dep't of Justice,
  878 F. Supp. 667 (S.D.N.Y. 1995)......................................................................10

Truitt v. U.S. Dep't. of State,
  897 F.2d 540 (D.C. Cir. 1990) ...........................................................................10

*Twist v. Meese,*
  854 F.2d 1421 (D.C. Cir. 1988) ....................................................................39, 40

U.S. Dep't of Justice v. Reporters Comm.,
  489 U.S. 749, 109 S. Ct. 1468 (1989).................................................................27

U.S. Dep't of State v. Ray,
  502 U.S. 164, 112 S. Ct. 541 (1991)....................................................................6

*U.S. v. Cicilline,*
  No. 07-10008-NMG, 2008 WL 427286 (D. Mass. Feb.13, 2008) ..........................21

*U.S. v. Nobles*,
    422 U.S. 225, 95 S. Ct. 2160 (1975).................................................................15

*\*U.S. Dep't of State v. Washington Post Co.*,
    456 U.S. 595, 102 S. Ct. 1957 (1982)............................................................22

*Valencia-Lucena v. U.S. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999)........................................................................12

*\*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973)..........................................................................7

*Vaughn v. Rosen*,
    523 F.2d 1136 (D.C. Cir. 1975)......................................................................13

*Vitarelli v. Seaton,*,
    147 F.3d 1148 (9th Cir. 1998).........................................................................37

*VoteHemp, Inc. v. DEA*,
    No. 02-CV-985 (RBW), slip op. (D.D.C. Oct. 15, 2004)...............................22

*\*Washington Post Co. v. U.S. Dep't of Health and Human Services*,
    690 F.2d 252 (D.C. Cir. 1982)..................................................................22, 24

*\*Weisberg v. U.S. Dep't of Justice*,
    745 F.2d 1476 (D.C. Cir. 1984)..................................................................9, 11

*Wood v. FBI*,
    432 F.3d 78 (2d Cir. 2005)..........................................................................6, 16

**STATUTES**

5 U.S.C. § 552(a)(4)(B) ...................................................................................6, 17

5 U.S.C. § 552(a)(6)(A)(i) ...........................................................................7, 8 , 9

5 U.S.C. § 552(a)(6)(A)(ii) ...............................................................................10

5 U.S.C. § 552(a)(6)(B)(i) ..................................................................................10

5 U.S.C. § 552(a)(6)(C)(i) ................................................................................8, 9

5 U.S.C. § 552(b) ................................................................................................36

5 U.S.C. § 552(b)(2) ......................................................................................2, 13

5 U.S.C. § 552(b)(5) ......................................................................................3, 15

5 U.S.C. § 552(b)(6) ......................................................................................3, 23

5 U.S.C. § 552(b)(7)(A) ......................................................................................4, 29, 30, 35, 36

5 U.S.C. § 552(b)(7)(C) ..............................................................................................4, 26, 28

5 U.S.C. § 552a(g)(1)(A) .....................................................................................................37

## CODE OF FEDERAL REGULATIONS

17 C.F.R. § 200.80 ...............................................................................................................36

17 C.F.R. § 200.301 .............................................................................................................37

17 C.F.R. § 200.304(c) ........................................................................................................37

## OTHER AUTHORITIES

James T. O'Reilly, *Federal Information Disclosure*
   § 7:18 (2000 ed & Supp. 2008) ......................................................................................31

Plaintiff Mark Cuban submits this Memorandum of Law in Opposition to the Motion for Partial Summary Judgment submitted by Defendant Securities and Exchange Commission ("SEC"), and in support of Mr. Cuban's Cross-Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Freedom of Information Act ("FOIA") was intended to permit access to official information and create a judicially enforceable public right to secure such information from "unwilling official hands."[1]   There can be no more "unwilling official hands" than those of the SEC in this case, which has consistently delayed, denied, and refused to comply with its obligations under FOIA and the Privacy Act.

Mr. Cuban sent FOIA and Privacy Act requests to the SEC in December 2008.  After receiving Mr. Cuban's proper FOIA and Privacy Act requests, the SEC failed to comply with its statutory deadlines to respond or produce the requested records.  When the SEC did finally respond, it was clear that it had not only failed to conduct any search for certain records, but that it intended to withhold all responsive records by an improper and overbroad application of the exemption applicable to records compiled for law enforcement purposes (Exemption 7(A)), and that it would not even attempt to produce segregable portions of allegedly exempt records, all in contravention of explicit provisions of FOIA.  The SEC continued to improperly withhold these records through the administrative appeals process and after Mr. Cuban filed this lawsuit, although the exemptions upon which it claims to justify its improper withholding have continuously shifted.  Moreover, despite SEC regulations which required the SEC to respond to Mr. Cuban's Privacy Act request, the SEC simply ignored that request, and never responded

---

[1]  *EPA v. Mink*, 410 U.S. 73, 80, 93 S. Ct. 827, 832 (1973) (*quoting* S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)).

until after Mr. Cuban filed this lawsuit.  As of this date, the only records the SEC has produced in response to any of the requests are two heavily redacted emails (produced in January 2010), making a mockery of the FOIA process.

By its Motion for Partial Summary Judgment, the SEC now seeks to block disclosure of any responsive records based on its inadequate *Vaughn* Index and declarations that are barely more informative than the agency's initial denial letters.  Those letters claimed *no* responsive records existed that were not exempt under the privilege for records compiled for law enforcement purposes, and those letters also showed the SEC had not conducted any search for certain categories of records.  Mr. Cuban submits that, for the following reasons, the SEC's Motion should be denied and his Cross-Motion for Summary Judgment should be granted:

First, the SEC's argument that Plaintiff failed to exhaust his administrative remedies as to certain requests is without merit.  Because the SEC failed to adequately notify Plaintiff of his administrative appeal rights with respect to those particular requests, Plaintiff's administrative remedies were constructively exhausted.

Second, the SEC's representations that it conducted an adequate search are not credible, because the SEC elsewhere admitted that it did not conduct any search at all for certain categories of documents (let alone did the SEC conduct a search "reasonably calculated" to uncover responsive documents).

Third, the SEC fails to establish the applicability of 5 U.S.C. § 552(b)(2) ("Exemption 2")[2] for certain withheld worksheets relating to the SEC's core function – investigating alleged violations of the U.S. securities laws.  Withholding them as matters that are "related solely to the

---

[2]   Exemption 2 exempts from mandatory disclosure records "related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).

internal personnel rules and practices" is improper, because the public can be expected to have a substantial interest in these records.  In addition, there is no administrative or other burden on the agency to produce them now, because the records have been located and are not voluminous.

<u>Fourth</u>, the SEC's attempt to use 5 U.S.C. § 552(b)(5) ("Exemption 5")[3] to shield certain intra- and inter-agency memoranda and communications must be rejected because the SEC's *Vaughn* Index and declarations are insufficient to determine whether any of the documents withheld actually qualify for protection as attorney-client privilege, attorney work product, or deliberative process materials.  The declarations and *Vaughn* Index lack sufficient detail and contain only conclusory statements; it is impossible to determine from the SEC's submissions whether Exemption 5 has been properly invoked.  Furthermore, the SEC makes no effort to separate purely factual, non-privileged, and post-decisional material from the withheld documents.  In short, the SEC fails to provide sufficient information to justify withholding documents under Exemption 5.

<u>Fifth</u>, the SEC fails to establish the applicability of 5 U.S.C. § 552(b)(6) ("Exemption 6")[4] to certain withheld records, because it has provided no evidence that the withheld material was contained in "personnel, medical, or similar files."  Moreover, it has only provided speculation and conclusory statements, not evidence, that its employees can be identified by producing redacted versions of the withheld documents, and that such identification would result in an "unwarranted invasion of personal privacy."

---

[3]  Exemption 5 exempts from mandatory disclosure "inter-agency or intra-agency memorandums of letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).

[4]  Exemption 6 exempts from mandatory disclosure all information about individuals in "personnel and medical files and similar files" when the disclosure of such information" would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

<u>Sixth</u>, the SEC's assertion of 5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)")[5] is improper, because the investigations recorded in some of the withheld documents were not for "law enforcement purposes," but rather for the purpose of monitoring its own employees.  In addition, the SEC withheld some of the documents "to protect privacy interests of staff names," which does not justify withholding entire documents.  FOIA requires that any segregable information be released, so the SEC must release these documents after deleting the allegedly exempt staff names.

<u>Seventh</u>, the SEC fails to establish the applicability of 5 U.S.C. § 552(b)(7(A) ("Exemption 7(A)")[6] to the records withheld under that exemption, since its declarations and functional categories used in lieu of a *Vaughn* Index do not provide sufficiently specific information about the records' nature or the reasons why disclosure could lead to harm.  In fact, it is likely that a significant number of the withheld documents pose no threat to active law enforcement proceedings – although they may well prove embarrassing to the SEC.

<u>Eighth</u>, even though the SEC's own regulations require it to properly consider and respond to Privacy Act requests, the SEC completely ignored Mr. Cuban's Privacy Act request in this matter and failed to provide any response at all until he filed this lawsuit.  Thus, any blanket exemption of the SEC's Office of Inspector General ("OIG") and Enforcement Division systems

---

[5]   Exemption 7(C) exempts from mandatory disclosure law enforcement information which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

[6]   Exemption 7(A) exempts from mandatory disclosure "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information ... could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).

of records under the Privacy Act should be deemed waived by the SEC's deliberate failure to comply with its own regulations.

Finally, and one last and independent reason the SEC's motion should be denied, the SEC fails to comply with Local Civil Rule 7(h)(1), which requires that its motion be accompanied by a statement of material facts as to which there is no genuine issue. Its motion should be denied in accordance with precedent in this District and in accordance with this Court's published General Order and Guidelines.

The reason for the SEC's dilatory tactics and demonstrated reluctance to produce any of the records requested by Mr. Cuban is no mystery; the SEC is currently involved in other litigation with Mr. Cuban.[7] Given the nature of Mr. Cuban's inquiry, there is a very real possibility that many of the documents the agency is withholding are deeply embarrassing and/or potentially prejudicial to the SEC's positions in the other litigation. These are not valid bases for exempting records from disclosure under FOIA. Because the SEC's submissions on this motion are not sufficient to enable the Court to determine which withheld documents are legitimately exempt, the agency has not met its burden on this motion. Consequently, the SEC's request for partial summary judgment must be denied and Mr. Cuban's cross-motion for disclosure of all documents not shown to be exempt must be granted.

---

[7]  The SEC initiated an enforcement action against Mr. Cuban in the U.S. District Court for the Northern District of Texas in November 2008 ("*SEC v. Cuban*"). Although *SEC v. Cuban* was dismissed by the District Court in July 2009, the SEC has appealed that dismissal, and Mr. Cuban's post-judgment motion for sanctions against the SEC is still pending before the District Court.

## STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Mark Cuban incorporates by reference his Local Civil Rule 7(h)(1) Statement of Material Facts as to Which There is No Genuine Issue filed concurrently with this Memorandum of Law and his Cross-Motion for Summary Judgment.

## ARGUMENT

## I.     FOIA STANDARD OF REVIEW

### A.     General FOIA Standard of Review

FOIA was enacted "to facilitate public access to Government documents," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S. Ct. 541, 546 (1991), and was designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 96 S. Ct. 1592, 1599 (1976) (internal quotation marks omitted).   Consistent with FOIA's purpose and design, "the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents."  *Ray*, 502 U.S. at 173, 112 S. Ct. at 546.  The agency must disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S. Ct. 2311, 2327 (1978).  FOIA exemptions are to be construed narrowly, "resolving all doubts in favor of disclosure," and "[t]he government bears the burden of establishing that any claimed exemption applies."  *Wood v. FBI*, 432 F.3d 78, 82-83 (2d Cir. 2005); 5 U.S.C. § 552(a)(4)(B).   To be entitled to summary judgment, the agency must prove that each responsive document was either produced or withheld pursuant to a validly applicable exemption.  *See, e.g., Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.), *cert. denied*, 513 U.S. 823 (1994).  Under the Act, federal courts are required to determine de novo whether documents were properly withheld.  5 U.S.C. § 552(a)(4)(B).

### B.     Standards Governing *Vaughn* Indexes

An agency seeking summary judgment must prove that each document that falls within the class of requested records has been produced, is unidentifiable, or is wholly exempt from FOIA's requirements. *Ruotolo v. Dep't of Justice*, 53 F.3d 4, 9 (2nd Cir. 1995); *Long v. U.S. Dep't of Justice*, 10 F. Supp. 2d 205, 209 (N.D.N.Y. 1998). Federal agencies are held to a rigorous standard of specificity because parties "who seek documents through FOIA are at a disadvantage" in that they "can only speculate as to the exact nature of the withheld documents." *Id.* at 209. The principal vehicle through which the government must carry that burden is an index in which each withheld document is described by source, custodian, date, content and claimed exemption and the basis for each claimed exemption is set forth with sufficient specificity to enable the court intelligently to evaluate the validity of the exemption. *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973); *St. Andrews Park, Inc. v. U.S. Dep't of Army Corps of Eng'rs*, 299 F. Supp. 2d 1264, 1271 (S.D. Fla. 2003).

## II.     THE SEC'S FOIA RESPONSE DID NOT NOTIFY PLAINTIFF OF APPEAL RIGHTS AS TO CATEGORIES FOR WHICH NO SEARCH WAS CONDUCTED

The SEC argues that Plaintiff failed to exhaust his administrative remedies with regard to FOIA Letter Nos. 7, 11, 12, and 13.[8] However, the SEC failed to notify Plaintiff of his appeal rights as to those requests as required by 5 U.S.C. § 552(a)(6)(A)(i), and Plaintiff's administrative remedies were thus constructively exhausted by the SEC's failure to provide a timely and adequate response to his requests. *See Ruotolo,* 53 F.3d at 9 (agency's response to

---

[8]   In Part II of its Motion, the SEC apparently does not seek summary judgment on its affirmative defense of exhaustion of administrative remedies, but instead requests dismissal of Plaintiff's claims under Rule 12(b)(6). The SEC's request for dismissal is untimely and cannot be granted by the plain language of Rule 12, which requires that a motion under Rule 12(b)(6) must made before any responsive pleading is filed. FED.R.CIV.P. 12(b)(6). As the SEC has already filed its answer in this case, its motion under Rule 12(b)(6) is untimely and must be denied.

requesters did not include notification of the right to appeal; there was thus no timely determination of the request, and the requesters were deemed to have exhausted their administrative remedies); *Dinsio v. FBI,* 445 F. Supp. 2d 305, 311 (W.D.N.Y. 2006) (same).

5 U.S.C. § 552(a)(6)(A)(i) provides:

> Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall--(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefore, and of the right of such person to appeal to the head of the agency any adverse determination;

5 U.S.C. § 552(a)(6)(A)(i).  Moreover, 5 U.S.C. § 552(a)(6)(C)(i) states:

> Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph.

5 U.S.C. § 552(a)(6)(C)(i).  Here, the SEC did not advise Plaintiff that he had a right to appeal "any adverse determination;" it advised Plaintiff only of his "right to appeal *the adequacy of our search* or *finding of no responsive information*."   Winter Declaration (SEC Motion Ex. 1) ("Winter Dec.") at Att. C.  Because the SEC refused to undertake a search for FOIA Letter Nos. 7, 11, 12, and 13, the "adequacy" of a search it did not conduct was not at issue.  Furthermore, because the SEC did not issue a finding that no responsive information existed as to FOIA Letter Nos. 7, 11, 12, and 13, that was not at issue, either.

The SEC did not state that its conclusion that "it had no means to conduct a reasonable search" for certain records was appealable or otherwise provide any notice to Plaintiff that he could appeal that decision.  *Id.*  Because the SEC did not properly notify Plaintiff of his right to appeal the SEC's decision that "it had no means to conduct a reasonable search," the SEC failed

to provide a proper and timely response to FOIA Letter Nos. 7, 11, 12, and 13, and Plaintiff's administrative remedies were therefore constructively exhausted under 5 U.S.C. § 552(a)(6)(C)(i). *Ruotolo,* 53 F.3d at 9; *Dinsio*, 445 F. Supp. 2d at 310.  Moreover, even if the SEC had so notified Mr. Cuban, the SEC's January 30, 2009 letter, Winter Dec. at Att. C, was untimely as it was more than twenty business days after the SEC's receipt of the requests, which the SEC admitted it received no later than December 23, 2008, *id.* at ¶ 83.  *See* 5 U.S.C. § 552(a)(6)(A)(i), 5 U.S.C. § 552(a)(6)(C)(i).  Therefore, the SEC's motion regarding FOIA Letter Nos. 7, 11, 12, and 13 must be denied.

## III.   SEC FAILS TO ESTABLISH THAT IT CONDUCTED AN ADEQUATE SEARCH FOR FOIA LETTER NOS. 7, 11, 12, AND 13

As a threshold inquiry on an agency's motion for summary judgment under FOIA, a federal court "must determine whether an agency has adequately searched its records prior to analyzing claims of exemption." *See Carney*, 19 F.3d at 812.  Where the record reveals "positive indications of overlooked materials," or otherwise contains evidence refuting the government's claim that it conducted a complete search for responsive information, the government is not entitled to summary judgment.  *Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979).

On a motion for summary judgment, "the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney*, 19 F.3d at 812.  In so doing, the agency may rely on declarations "indicating that the agency has conducted a thorough search and giving reasonably detailed explanations" for its non-disclosures.  *See id*. (*citing Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993)).  Such declarations must be "relatively detailed and non-conclusory."  *See, e.g., SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991); *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476,

1485 (D.C. Cir. 1984).  Thus, a "satisfactory agency affidavit should, at a minimum, describe in reasonable detail the scope and method by which the search was conducted" and should "'describe at least generally the structure of the agency's file system which makes further search difficult.'"  *Maynard*, 986 F.2d at 559-60 (*quoting Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986) (Scalia, J.)).   While agency declarations are afforded a presumption of good faith, *see Carney*, 19 F.3d at 812 (*quoting SafeCard Servs.*, 926 F.2d at 1200), that presumption may be rebutted by "a showing of bad faith sufficient to impugn the affidavits."  *Triestman v. U.S. Dep't of Justice*, 878 F. Supp. 667, 672 (S.D.N.Y. 1995) (*citing Carney*, 19 F.3d at 812).   Thus, a FOIA requester can rebut the agency's affidavit by showing that the agency's search was not made in good faith, *Maynard*, 986 F.2d at 560, and may raise a question of fact precluding summary judgment by adducing tangible proof that the agency has acted in bad faith.  *Carney*, 19 F.3d at 813.

The Winter Declaration is not reasonably detailed or non-conclusory with respect to FOIA Letter Nos. 7, 11, 12, and 13.  The Winter Declaration is therefore insufficient to prove that the SEC conducted an adequate search, and is tangible proof that the agency acted in bad faith.  The Winter Declaration only provides the conclusory statement that the SEC had "no reasonable means to conduct a search" for documents responsive to FOIA Letter Nos. 7, 11, 12, and 13, and fails to provide any details as to why this might be so.  Winter Dec. at Att. C. Furthermore, the SEC's failure to conduct any search, much less attempt to explain in any detail why it did not conduct a search, is evidence of the SEC's bad faith in complying with its search

obligations sufficient to impugn the Winter Declaration and rebut the presumption that the agency acted in good faith. *See Maynard,* 986 F.2d at 560.[9]

The SEC has a well-documented history of noncompliance with FOIA, which casts doubt on any representations the SEC makes about the adequacy of its search, and establishes that the SEC is not entitled to a presumption of good faith. In a recent audit of the SEC's compliance with FOIA (the "OIG Audit"), the SEC OIG determined that the SEC has "inadequate or incorrect procedures for determining whether responsive documents exist and how exemptions . . . are applied, which have the effect of creating a presumption in favor of withholding, rather than disclosure, as required by FOIA." *See* Declaration of David Ross ("Ross Dec."), attached to Statement of Material Facts as to Which There is No Genuine Issue, Ex. 6, SEC OIG Office of Audits, Report No. 465, September 25, 2009, at 9. The OIG Audit further noted that the SEC makes an inordinately high number of "No Information Found" responses to FOIA requests due to the "SEC's method of processing FOIA requests" and because of "inadequate search capabilities" when searching for documents in key databases. *Id.* at 11. The OIG Audit also found that "[d]ocuments are not sufficiently inspected to determine if the information is potentially responsive and if it can be disclosed." *Id.* Moreover, the OIG Audit determined that the SEC's "search process actually prevents the discovery of information that is responsive to

_____

[9] A search will be considered adequate if it was "reasonably calculated to uncover all relevant documents." *Truitt v. U.S. Dep't. of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (citations omitted); *see also Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002) (search must be "reasonably designed to identify and locate responsive documents") (citations omitted). This includes an agency's decisions about which offices or databases to search, which also must be "reasonably calculated to uncover all relevant documents." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (an agency "cannot limit its search to only one [office] if there are others that are likely to turn up the information requested."). Reasonableness must be evaluated in the context of each particular request. *See Davis v. U.S. Dep't of Justice*, 460 F.3d 92, 103 (D.C. Cir. 2006); *Weisberg*, 745 F.2d at 1485.

FOIA requests." *Id.* at 12.  Instead of "actually reviewing documents relating to the investigation that is the subject of the FOIA request," the SEC "relies upon a database that does not have fully accurate information and makes the decision to withhold any and all potential responsive documents in their entirety." *Id.* at 13.

In this case, the SEC failed to satisfy its obligation to search in a manner "reasonably calculated to uncover" responsive documents.  First, the Winter Declaration indicates that the SEC did not conduct any search at all, let alone one that was "reasonably calculated" to uncover responsive documents.  The Winter Declaration states only that "it had no means to conduct a reasonable search" for records responsive to FOIA Letter Nos. 7, 11, 12, and 13.  Winter Dec. at Att. C.  The Winter Declaration says nothing about whether anyone within the SEC conducted a search; nor does it provide an explanation as to why no search was conducted.  *Id.*  When an agency fails to conduct any search at all or provide details as to why, it fails to comply with its search obligations under FOIA.  *See Center For Nat'l Sec. Studies v. U.S. Dep't of Justice,* 215 F. Supp. 2d 94, 111 (D.D.C. 2002) (FBI's failure to conduct a search or explain its failure to search did not satisfy its obligation to conduct a search "reasonably calculated" to uncover responsive documents) (*aff'd in part, rev. in part on other grounds*, 331 F.3d 918 (D.C. Cir. 2003)).

It is not credible that the SEC lacked "means to conduct a reasonable search" for records of any: (1) trading history by SEC personnel in Mamma.com securities; (2) internal investigation into certain allegations in the [OIG]'s Semiannual Report to Congress for the Period April 1, 2008 to September 30, 2008 ("Report"); or (3) internal investigation into SEC personnel sending a Wells notice prior to the SEC staff substantially completing their investigation of the recipient of the Wells notice, advising a witness not to communicate with or otherwise be available to

someone involved in an SEC investigation, or failing to forward a Wells Submission to the Commission.  Winter Dec. at Atts. A, C.  An agency's search is unreasonable if it fails to follow through on obvious leads to discover requested documents.  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999).  Here, when the subject of these requests concerned internal investigations into misconduct by SEC personnel, including misconduct referred to by the SEC OIG in its Report, there were obvious leads the SEC could investigate for responsive documents, such as the SEC OIG or the SEC's Office of General Counsel, which would likely have been apprised of such complaints of misconduct.  The D.C. Circuit has found that "[w]hen all other sources fail to provide leads to the missing record, agency personnel should be contacted if there is a close nexus . . . between the person and the particular record."  *Id*. at 328.  In this case, the SEC made no effort to conduct a reasonable search or to investigate obvious leads to locate responsive documents, and its failure to do either of those things is further evidence of its bad faith with respect to its search obligations.  Accordingly, because the SEC's evidence does not establish that it conducted an adequate search, the SEC is not entitled to summary judgment.

## IV.    THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS CLAIM FOR EXEMPTION 2

### A.    Standards Governing Exemption 2 Claims

Matters that are related solely to the internal personnel rules and practices of an agency are exempt from disclosure under FOIA.  5 U.S.C. § 552(b)(2).  However, "Congress intended that Exemption 2 be interpreted narrowly and specifically."  *Vaughn v. Rosen*, 523 F.2d 1136, 1142 (D.C. Cir. 1975).  The line sought to be drawn by Exemption 2 "is one between minor or trivial matters and those more substantial matters which might be the subject of legitimate public interest."  *Id.*  The clear legislative intent of FOIA is to "assure public access to all governmental

records whose disclosure would not significantly harm specific governmental interests." *Soucie v. David*, 448 F.2d 1067, 1080 (D.C. Cir. 1971).

The government entity claiming the exemption has the burden of establishing that the materials and issues in question are related "solely" to "internal personnel rules and practices." *Aug v. National R.R. Passenger Corp.*, 425 F. Supp. 946, 950 (D.D.C. 1976). Exemption 2 applies only to routine housekeeping matters in which it can be presumed the public lacks any substantial interest. *Rose,* 425 U.S. at 369-70. The thrust of Exemption 2 is simply to relieve government agencies of the burden of assembling and maintaining for public inspection matters in which the public cannot reasonably be expected to have an interest. *Id.* at 369. But if the material sought is subject to a genuine public interest, the exemption is not applicable. *Id.* If portions of the documents requested contain some information that could be classified as internal personnel rules and practices as well as other types of nonexempt information, the documents must be disclosed. *See Stokes v. Brennan*, 476 F.2d 699, 703 (5th Cir. 1973) (OSHA training manual ordered disclosed because it contained statement of established agency policies).

### B.     The SEC's Declarations and *Vaughn* Index Fail to Substantiate the SEC's Reliance on Exemption 2

The SEC claims that the "three small files" it is withholding under Exemption 2 are "administrative documents" and are "primarily internal tracking materials." SEC Memorandum of Law at 9. But the withheld documents are records pertaining to informal SEC investigations, and thus cannot be "routine housekeeping matters" in which the public would presumably lack interest. They deal with the core function of the agency – investigating alleged violations of the U.S. securities laws – and, as such, the public can be expected to have a substantial interest in these documents. In this case, they are exactly the kind of material Plaintiff sought by his requests – records indicating if and when the SEC conducted an investigation of

14

Sharesleuth.com. The records have been located, they are not voluminous, and there is no administrative or other burden to the agency to produce them now.

## V.    THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS CLAIM FOR EXEMPTION 5

### A.    Standards Governing Exemption 5 Claims

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To qualify, a document must satisfy two conditions: its source must be a government agency, and it must fall within a privilege against discovery that would apply in litigation against the agency. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S. Ct. 1060, 1065 (2001); *NLRB v. Sears, Roebuck & Co*., 421 U.S. 132, 148, 95 S. Ct. 1504, 1515 (1975). Those privileges include the privilege for attorney work-product and what is sometimes called the "deliberative process" privilege. *Klamath,* 532 U.S. at 8, 121 S. Ct. at 1065. Work product protects "mental processes of the attorney," *U.S. v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170 (1975), while deliberative process covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Sears, Roebuck & Co.*, 421 U.S. at 150, 95 S. Ct. at 1516 (internal quotation marks omitted).

### B.    The SEC's Declarations and *Vaughn* Index Do Not Adequately Substantiate the SEC's Reliance on Exemption 5

#### 1.    Attorney-Client Privilege

To demonstrate that the attorney–client privilege justifies the withholding of documents, the agency must establish that the information in those documents was communicated to or by an attorney as part of a professional relationship in order to provide the agency with advice on the legal ramifications of its actions. *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d

242, 254 (D.C. Cir. 1977).   In addition, the agency must show that the information is confidential; there must be confidentiality both at the time of the communication in question and since that time.  *Id.*  Such confidentiality requires limited access to the documents within the agency itself.  *Canadian Javelin, Ltd. v. SEC,* 501 F. Supp. 898, 902 (D.D.C. 1980).  The burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).  To prove the continued confidential nature of the documents, the agency must "demonstrate that the documents, and therefore the confidential information contained therein, were circulated no further than among those members 'of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication.'"  *Id.*, *quoting Mead Data Central*, 566 F.2d at 253 n. 24.  If the communication was shared with third parties, the privilege is lost.  *Mead Data Central,* 566 F.2d at 254.  Documents based on facts acquired from outside persons and sources are not covered by the exemption.  *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980).

The SEC's *Vaughn* Index and declarations fail to establish the applicability of the attorney-client privilege, and thus fail to satisfy its burden to prove that Exemption 5 applies.  Naked assertions that documents are covered by the privilege are not enough.  The SEC must show for each document claimed to be subject to the privilege that the information was communicated by an attorney for the purpose of obtaining legal advice, and that the communication was kept confidential within the agency and was kept from third parties.  None of the documents are described in enough detail on the SEC's *Vaughn* Index or the SEC's declarations to allow the Court to determine whether the privilege applies.

For example, the Pinansky Declaration (SEC Motion Ex. 4) ("Pinansky Dec.") states that some of the alleged attorney-client communications listed in the *Vaughn* Index consist of emails sent "to or from" an attorney with the Office of General Counsel ("OGC"). However, emails sent *to* an OGC attorney are not privileged unless they convey confidential information for the purpose of obtaining legal advice. *Mead,* 566 F.2d at 254.

The Pinansky Declaration also states that "handwritten notes from conferences with an OGC attorney" are included. This description is inadequate because it fails to describe whether these notes contain confidential legal advice or simply the thoughts of the note taker, and further does not state whether these notes were kept confidential.

The Pinansky Declaration then describes "emails that describe communications with an OGC attorney." This means that the emails were not actually attorney-client communications, but simply communications among non-attorney agency employees. The Declaration does not contain sufficient information to reach a conclusion as to whether these emails were communications between an attorney and client for the purpose of obtaining legal advice, and, as such, the attorney-client privilege thus cannot be said to apply to this category of emails.

In sum, the SEC fails to carry its burden to show that the attorney-client privilege applies by producing evidence that each of the withheld documents are communications from an attorney for the purpose of obtaining legal advice, and that each document was also kept confidential within the agency and from third parties. Therefore, Exemption 5 does not apply to *any* documents for which the SEC asserts the attorney-client privilege, and the SEC must be ordered to produce those documents. *See Vaughn* Index entries 11, 21, 25, 26, 29, 32, 34, 35, 41-44, 53, 55, 57, 59, 61, 63, and 63. In the alternative, the Court should require that the SEC submit these documents for *in camera* review so that it can ascertain whether the attorney-client

privilege applies to each document.  *See* 5 U.S.C. § 552(a)(4)(B) (authorizing courts to "examine the contents of ... agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions ....").

## 2.      Attorney Work Product

The attorney work product privilege protects "the files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways" prepared in anticipation of litigation.  *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 394 (1947).  The "primary motivating purpose behind the creation of a document" must be to aid in possible future litigation.  *Janicker v. George Washington University*, 94 F.R.D. 648, 650 (D.D.C. 1982) (holding an investigative report prepared in the ordinary course of business not immunized by work-product privilege).

The SEC's *Vaughn* Index and declarations are insufficient to carry its burden to prove that the work-product privilege applies to the withheld documents.  First, it is apparent from the *Vaughn* Index that the SEC seeks to include materials that were not prepared by an attorney or at the direction of an attorney to aid in possible future litigation.  For example, some entries are described as "internal email chain between HR staff and SEC supervisors" or "internal email exchange between HR and SEC supervisor."  *See Vaughn* Index entries 12-22, 29-30, 36, 46, 49-51, 54, 56, 60-62, 64, and 77.  These entries make no reference to being prepared by or at the direction of an attorney or that they were prepared in anticipation of litigation.  As these email chains were not created by an attorney, they therefore do not reflect the mental impressions of an attorney prepared in anticipation of litigation.  Therefore, the work-product privilege, and thus Exemption 5, does not apply to *Vaughn* Index entries 12-22, 29-30, 36, 46, 49-51, 54, 56, 60-62, 64, and 77 and these documents must be produced.

The SEC also claims as attorney work product the handwritten notes prepared by the "HR staff" from their conferences with other SEC employees or supervisors.  *See Vaughn* Index entries 32-33, 38-40, 44, 48, and 52.  These are clearly non-attorney employee notes.  The HR staff members are not alleged to be attorneys and their notes of conferences with other SEC employees and supervisors cannot be considered the mental impressions of an attorney prepared in anticipation of litigation.  Such notes, because they are not prepared by or at the direction of an attorney, would not be exempt from discovery for a party in litigation with the agency, and they are thus not subject to the Exemption 5 and must be produced.

The SEC also claims that notes prepared by the HR staff from conferences with or including an OGC attorney are subject to the work product privilege.  *See Vaughn* Index entries 34-35, 41, 43, 53, and 55.  Yet the SEC fails to provide any evidence that these notes were prepared at the direction of the OGC attorney in anticipation of litigation, which is the only way that such notes could fall under the attorney work product privilege.  Further, the SEC cites no case, and we have discovered no case, which holds that such notes are attorney work product.  Therefore, the SEC has failed to carry its burden to prove that these notes are protected as attorney work product and must be produced.

Finally, the SEC withheld some email chains as work product only because an OGC attorney was included somewhere in the email chain.  *See Vaughn* Index entries 10-11, 25-26, 31, 37, 39, 42, 57, 59, and 63.  This is insufficient to support a claim of attorney work-product privilege.  As discussed above, to the extent the email chain was not prepared by or at the direction of an attorney in anticipation of litigation, it does not qualify as attorney work product. *See, e.g., Janicker, supra.*  But because the SEC does not include any details in its declarations or *Vaughn* Index for these email chains, it impossible for the Court determine whether any portion

19

of those emails which might include an OGC attorney actually qualify as attorney work product. The SEC has the burden to produce sufficient proof that the work product privilege applies, and it has failed to carry its burden of proof as to these emails as well.   Therefore, *Vaughn* Index entries 10-11, 25-26, 31, 37, 39, 42, 57, 59, and 63 must be produced.

### 3. Deliberative Process Privilege

The deliberative process privilege "shields from public disclosure confidential inter-agency memoranda on matters of law or policy." *National Wildlife Fed'n v. U.S. Forest Serv*., 861 F.2d 1114, 1116 (9th Cir. 1988).  It covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath,* 532 U.S. at 8, 121 S. Ct. at 1065-1066.

The Supreme Court has restricted the deliberative process privilege to materials that are both predecisional and deliberative.  *See EPA v. Mink*, 410 U.S. 73, 88, 93 S. Ct. at 836 (1973). In other words, to qualify for the privilege, a document must be (1) predecisional, that is, "antecedent to the adoption of agency policy," and (2) deliberative, that is, actually "related to the process by which policies are formulated." *National Wildlife,* 861 F.2d at 1117 (citation omitted).

"A predecisional document may be virtually any document that contains personal opinions and is designed to assist agency decision-makers in making their decisions." *Mo. Coal. for the Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008).  A document is considered "predecisional" if the agency can "(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." *Providence Journal Co. v. U.S. Dep't of the Army*, 981 F.2d 552, 557 (1st Cir. 1992) (internal

quotation marks and citations omitted).   A document is "deliberative" if it "(i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency."   *Id.* at 559 (internal quotation marks and citations omitted).   In other words, a document is "predecisional" if it precedes the decision to which it was applied and it is "deliberative" if it constitutes a statement of opinion regarding final policy "rather than a description of the ultimate policy itself."   *U.S. v. Cicilline*, No. 07-10008-NMG, 2008 WL 427286, at *1 (D. Mass. Feb.13, 2008).

Because the deliberative process privilege is restricted to the intra-governmental exchange of thoughts that actively contribute to the agency's decision-making process, factual statements or post-decisional documents explaining or justifying a decision already made are not shielded.   *See Sears, Roebuck*, 421 U.S. at 151-52; 95 S. Ct. at 1517. *Mink*, 410 U.S. at 88, 93 S. Ct. at 837.   The deliberative process privilege does not protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.   *Providence Journal Co.*, 981 F.2d at 562.

The SEC's *Vaughn* Index and declarations are insufficient to determine whether any of the documents withheld actually qualify for protection as deliberative process materials.   The declarations and Vaughn Index lack sufficient detail and contain only conclusory statements regarding alleged "pre-decisional deliberations"; they utterly fail to "(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which

it relates." *Cicilline, supra.*  It is impossible to determine from the SEC's submissions whether the deliberative process privilege has been properly invoked.  Furthermore, the SEC makes no effort to separate purely factual and post-decisional material from the withheld documents.  In short, the SEC failed to provide sufficient information to justify withholding documents under the deliberative process privilege.

## VI.   THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS CLAIM FOR EXEMPTION 6

### A.   Standards Governing Exemption 6 Claims

Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Courts must engage in a two-step de novo inquiry to determine first whether the information sought is to be found in personnel, medical, or similar files, and, if so, whether its release would constitute a "clearly unwarranted invasion of personal privacy."  *Arieff v. U.S. Dep't of the Navy*, 712 F.2d 1462, 1466 (D.C. Cir. 1983); *Washington Post Co. v. U.S. Dep't of Health and Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982).

The term "similar files" encompasses "detailed Government records on an individual which can be identified as applying to that individual."  *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602, 102 S. Ct. 1957 (1982).  While this definition of "similar files" appears to be broad, it does have limits.  For example, information that "merely identifies the names of government officials who authored documents and received documents" does not generally fall within Exemption 6.  *Aguirre v. SEC,* 551 F. Supp. 2d 33, 53 (D.D.C. 2008) (*quoting VoteHemp, Inc. v. DEA*, No. 02-CV-985 (RBW), slip op. at 12 (D.D.C. Oct. 15, 2004)).

If documents are found to be "personnel and medical files and similar files," the next step is to determine whether disclosure "would constitute a clearly unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(6).   This inquiry requires two steps.   First, the Court must decide whether disclosure "compromise[s] substantial privacy interests."   *Ripskis v. Dep't of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984).   The inquiry ends if substantial privacy interests are not compromised; otherwise, the Court weighs "the potential harm to privacy interests" against "the public interest in disclosure of the requested information."

**B.      The SEC's Declarations and *Vaughn* Index Do Not Adequately Substantiate the SEC's Reliance on Exemption 6**

With respect to the Matter Under Investigation ("MUI") files withheld (*Vaughn* Index entries 78-80), the SEC fails to satisfy the first prong of the Exemption 6 inquiry, because it has provided no evidence these records were contained in "personnel, medical, or similar files."   In fact, given their description as "internal data entry forms," the withheld documents are clearly not "personnel, medical or similar files" and thus do not qualify for Exemption 6 protection.   As for the second prong of the inquiry, there is no evidence that an "unwarranted invasion of personal privacy" would result from disclosure.   At best, the SEC's evidence merely establishes that the names of employees who authored or received these documents would be disclosed, which does not generally fall within Exemption 6.   *Aguirre v. SEC,* 551 F. Supp. 2d at 53. Therefore, the SEC fails to carry its burden to establish that Exemption 6 should apply to *Vaughn* Index entries 79-80.

The SEC's *Vaughn* Index describes the remaining records withheld under Exemption 6 as being related to the misconduct or discipline of an SEC employee.   Assuming that these descriptions are accurate, the relevant inquiry is whether disclosure of the records with the personal identifying information redacted would result in an unwarranted invasion of personal privacy.   In resolving this inquiry, a court is required to balance the public interest in disclosure against privacy interests, keeping in mind Congress' "dominant objective" under FOIA to

provide full disclosure. *Washington Post*, 690 F.2d at 260. FOIA's requirement that disclosure be "clearly unwarranted" instructs courts to "tilt the balance [of disclosure interests against privacy interests] in favor of disclosure," recognizing that the presumption in favor of disclosure under Exemption 6 "is as strong as can be found anywhere in the Act." *Id*. at 261.

To establish the existence and extent of any invasion of privacy created by disclosure in this case, the SEC must first show that the public would be able to link the disclosures requested with the subject of the documents. The likelihood of such identification must be "more palpable than [a] mere possibilit[y]." *Rose*, 425 U.S. at 381 n. 19, 96 S. Ct. at 1608 n. 19. The exemption applies only if the SEC's records on its employee "*can* be identified as applying to that individual . . . ." *Id*. (emphasis in original). An increased likelihood of speculation as to the identity of the employee is insufficient to invoke the exception. Only the likelihood of actual identification justifies withholding the requested documents under Exemption 6. *Arieff*, 712 F2d at 1468.

Here, the SEC has only provided speculation and conclusory statements, not evidence, that its employees can be identified by producing the withheld documents. The Pinansky Declaration states:

> The documents listed in the Vaughn Index as withheld pursuant to Exemption 6 involve documents that relate to the sensitive personnel matter discussed above and in addition include one or more of the following: names, email addresses, and medical conditions of identifiable individuals. Some also include details on employee performance, misconduct allegation and discipline of identifiable individuals. Some also include internal memoranda on proposed discipline.

Pinansky Dec. at ¶ 6. The Pinansky Declaration contains no averments or information that would allow the Court to determine whether the individual would remain identifiable after the personal identifying information has been redacted. The SEC argues only that "the media has

covered the SEC's securities fraud case against Cuban and Cuban's allegations regarding the SEC staff."  SEC Memorandum of Law at 19.  This is no more than speculation, and at best a possibility, which is insufficient to carry the SEC's burden of proof.  *See Rose*, 425 U.S. at 380, 96 S. Ct. at 1608.  Inasmuch as the SEC has produced no evidence that would support a finding that release of the documents (even with personal identifying information redacted) would result in an unwarranted invasion of personal privacy, the SEC has failed to carry its burden of proof.

Even if the individual employee involved can be identified after the redaction of any personal identifying information, the strong public interest in disclosure outweighs the privacy interest of the individual involved.  Plaintiff assumes, although he cannot know with complete certainty, that the SEC employee concerned is former SEC Trial Counsel Jeffrey B. Norris, the subject of Mr. Cuban's FOIA Letter, Request No. 8 ("records of any internal investigation of SEC Trial Counsel Jeffrey B. Norris").  Winter Dec., Att. A.  The same employee was also the subject of two requests under Mr. Cuban's FOIA/Privacy Act Letter (Request No. 6, for records "of any internal investigation of SEC Trial Counsel Jeffrey Norris relating to Mr. Cuban" and No. 7, for records "of any internal investigation relating to the conduct of SEC personnel involved with any investigation of Mr. Cuban or Mamma.com").  Winter Dec., Att. B.  While the SEC was investigating Mr. Cuban, and before Mr. Cuban was aware of the SEC's investigation, Mr. Norris, using his SEC email account, sent a series of bizarre and disturbing emails to Mr. Cuban.  *See* WSJ Law Blog, "Maverick Exchange: The Emails Between Mark Cuban and Jeffrey Norris," Nov. 20, 2008 (available at http://blogs.wsj.com/law/2008/11/20/a-maverick-exchange-the-emails-between-mark-cuban-and-jeffrey-norris/tab/article/).  Among other things, Mr. Norris called Mr. Cuban a traitor and accused him of being unpatriotic.  Mr. Norris copied then-SEC Chairman Christopher Cox on the emails.  *Id.*

Mr. Norris's email exchanges with Mr. Cuban were published and discussed in the press. *Id.* Because Mr. Norris was a Trial Counsel in the SEC's Enforcement Division, and was employed in the SEC's Fort Worth office that was involved with the investigation of Mr. Cuban, the public has an interest in knowing whether Mr. Norris's actions were in any way connected to the SEC's investigation of Mr. Cuban. The public also has a strong interest in knowing whether the SEC authorized, approved, or condoned Mr. Norris's actions in regard to Mr. Cuban, or disapproved of those actions and appropriately disciplined Mr. Norris. Therefore, disclosure of the withheld records outweighs any privacy concern of the employee involved because they will shed light on official misconduct committed by an SEC employee charged with enforcing the U.S. securities laws. The public is entitled to know whether the SEC condoned or tacitly approved of Mr. Norris's conduct regarding Mr. Cuban. *See, e.g., Aguirre,* 551 F. Supp. 2d at 56 (public interest in disclosure outweighed privacy interest in emails regarding termination of SEC employee involved in matter covered extensively by the press).

The SEC fails to carry its burden to prove its reliance on Exemption 6. Therefore, Exemption 6 does not apply and all documents withheld pursuant to Exemption 6 must be produced.

## VII. THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS CLAIM FOR EXEMPTION 7(C)

### A. Standards Governing Exemption 7(C) Claims

Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes" when production of such records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 7(C) requires a court to "balance the public interest in disclosure against the [privacy

interest Congress intended the Exemption to protect." *U.S. Dep't of Justice v. Reporters Comm.*, 489 U.S. 749, 776, 109 S. Ct. 1468, 1483 (1989).

However, in reviewing Exemption 7(C), the court must distinguish between internal investigations conducted for law enforcement purposes and general agency internal monitoring that might reveal evidence that later could give rise to a law enforcement investigation: an agency's investigation of its own employees is for "law enforcement purposes only if it focuses directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could if proved, result in civil or criminal sanctions." *Stern v. FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984) (*citing Rural Housing Alliance v. U.S. States Dep't of Agriculture*, 498 F.2d 73, 81 (D.C. Cir. 1974)).   The court further stated that "[i]f this broad interpretation is accepted, however, we immediately encounter the problem that most information sought by the Government about its own operations is for the purpose ultimately of determining whether such operations comport with applicable law, and thus is 'for law enforcement purposes'.   Any internal . . . monitoring conceivably could result in disciplinary action, in dismissal, or indeed in criminal charges against the employees.   But if this broad interpretation is correct, then the exemption swallows up the Act . . . [and] defeats one central purposes of the Act to provide public access to information concerning the Government's own activities." *Id.*   Accordingly, this Circuit has held that "an agency's general internal monitoring of its own employees to insure compliance with the agency's statutory mandate and regulations is not protected from public scrutiny under Exemption 7, although another exemption, such as Exemption 6, may apply." *Id.*

**B.      The SEC's *Vaughn* Index Does Not Adequately Substantiate the SEC's Reliance on Exemption 7(C)**

**1.      Documents Nos. 9, 16, 17, and 18**

According to the SEC's *Vaughn* Index, Document Nos. 9, 16, 17, and 18 are records of internal SEC investigations into whether an agency employee violated agency regulations. Therefore, by the SEC's own admission, the investigations recorded in the withheld documents were not for "law enforcement purposes" but for the purpose of monitoring its own employees, and Exemption 7(C) is thus inapplicable.  *See Stern*, *supra.*  Document Nos. 9, 16, 17, and 18 were thus improperly withheld by the SEC and Plaintiff is entitled to summary judgment ordering their release.  *Id.*

**2.      Documents Nos. 78, 79 and 80**

According to the *Vaughn* Index, these withheld documents are MUI files and related documents.  *Vaughn* Index at 11.  The SEC withheld these documents under Exemption 7(C) "to protect privacy interests of staff names."   However, if a record contains information that is exempt from disclosure, any reasonably segregable information must be released after deleting the exempt portions, unless the non-exempt portions are inextricably intertwined with exempt portions.  5 U.S.C. § 552(b); *see Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999).  The court errs if it "simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof."  *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n. 4 (D.C. Cir. 1991) (*quoting Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 744 (9th Cir. 1979)).  Even if it would be "an unwarranted invasion of personal privacy" to release the SEC staff names found on these documents (which Plaintiff does not concede) the SEC has presented no evidence that these staff names are not segregable from the remainder of the documents.  The Declaration of Kenneth

Hall Declaration (SEC Motion Ex. 3) ("Hall Dec."), does not allege that the names cannot be redacted or that the non-exempt information is not reasonably segregable from the information withheld under Exemption 7(C).  Therefore, at a minimum, the allegedly exempt information should be redacted and the redacted documents released to Plaintiff.

## VIII.   THE SEC HAS NOT CARRIED ITS BURDEN OF PROOF REGARDING ITS CLAIM FOR EXEMPTION 7(A)

Examination of the SEC's claim of Exemption 7(A) should begin with the assumption that the SEC has not complied with its obligations under FOIA.  The September 2009 OIG Audit repeated criticized the SEC's improper use and overuse of Exemption 7(A) to deny FOIA requests.  According to the OIG Audit, the SEC has "inadequate or incorrect procedures for determining . . . how exemptions, such as Exemption 7(A), are applied" and that this has created "a presumption in favor of withholding, rather than disclosure, as required by FOIA."  Ross Dec., Ex. 6, at 9.  The OIG Audit found that 67 percent of all SEC FOIA denials were due to Exemption 7(A).  *Id.* at 11.  The OIG Audit found that the excessive number of denials under Exemption 7(A) were the result of deficiencies in the SEC's method of processing FOIA requests, which consisted of determining whether an investigation was listed as "open," then automatically recommending denial under Exemption 7(A).  *Id.* at 12.

The OIG Audit further found that "documents were not sufficiently inspected to determine if the information is responsive and if it can be disclosed."  *Id.* at 11.  According to the OIG Audit, the SEC assumes that "the disclosure of *any* information (including information available publically)" regarding an open investigation "constitutes 'interference with law enforcement proceedings.'"  *Id.* at 13.  The OIG Audit found that instead of actually reviewing the documents relating to the investigation that is the subject of the FOIA request, the SEC relies on an inaccurate database to decide to withhold "any and all potential responsive documents in

their entirety." *Id.* Further, the OIG Audit found that administrative of appeal from a denial under Exemption 7(A) was pointless, because the SEC "supports and defends the practice of limited and perfunctory document review." *Id.* at 14. It is apparent from the evidence submitted in support of its Exemption 7(A) claims in this case that the SEC has not changed any of the inadequate FOIA practices criticized in the OIG Audit, and this Court should not tolerate or condone the SEC's refusal to comply with FOIA and its misuse of Exemption 7(A).

A.      **Standards Governing Exemption 7(A) Claims**

The SEC has withheld an undisclosed number of documents under Exemption 7(A), which exempts from disclosure records or information "compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." To fit within Exemption 7(A), the government must show that (1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1164 (3d Cir. 1995). The SEC's declarations submitted in support of its Motion fail to satisfy this standard.

B.      **Standards for Categorical Approach to Claims Under Exemption 7(A)**

The Supreme Court has held that in cases involving Exemption 7(A), instead of providing an index describing each document withheld with the reason for withholding it, an agency may classify documents according to "functional" categories and then explain how disclosure of the records within each category would specifically interfere with a law enforcement investigation or proceeding. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236, 98 S. Ct. 2311, 2324 (1978). However, the Supreme Court's approval of this categorical approach still requires that the agency make a sufficient showing of a logical connection between disclosure and an

articulable potential harm.  *In re Dep't of Justice*, 999 F.2d 1302, 1309-1310 (8th Cir. 1993); *Curran v. Dep't of Justice*, 813 F.2d 473, 475 (1st Cir. 1987).

The agency has the burden to demonstrate that Exemption 7(A) may be applied categorically.  *Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986); *see also In re Dept. of Justice*, 999 F.2d at 1309 (discussing *Bevis* and *Robbins Tire*, 437 U.S. at 235-36, 98 S. Ct. at 2323-2324).  In order to apply an exemption categorically, there must be some indicia that the individual documents within the category of documents are similar; and that the agency has reviewed and ensured that the individual documents it seeks to include in the category of documents are indeed similar.  *See id.; see also Campbell v. Dept. of Health & Human Servs.*, 682 F.2d 256, 265 (D.C. Cir. 1982); *Institute for Justice & Human Rights v. Executive Office of the U.S. Attorney,* No. C-96-1469, 1998 WL 164965 at \*5-7 (N.D. Cal. March 18, 1998).  Thus, as numerous courts have held, where the categorical approach is used, the agency must still: (1) define functional categories of documents, (2) conduct a document-by-document review to assign documents to proper categories, and (3) explain to the court how release of each category would interfere with enforcement proceedings.  *Lawyers Committee for Civil Rights of San Francisco Bay Area v. U.S. Dep't of Treasury*, No. C 07-2590 (PJH), 2009 WL 1299821, at \* 3 (N.D. Cal. May 11, 2009); *accord, Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986); *see* James T. O'Reilly, Federal Information Disclosure § 7:18 (2000 ed. & Supp. 2008). Therefore, "although [an agency] need not justify its withholding on a document-by-document basis in court, the [agency] must itself review each document to determine the category to which it properly belongs." *Bevis*, 801 F.2d at 1389-90.  The categories used must allow the court to trace a rational link between the nature of the document withheld and the alleged likely

31

interference with a prospective enforcement proceeding. *Id.* at 1389; *accord, Crooker v. Bureau of Alcohol, Tobacco, and Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986).

Categories are not sufficient if they are divided by the "various methods of transmission" and do not convey "the type of information being transmitted." *Owens v. U.S. Dep't of Justice*, No. 04-1701 (JDB), 2006 WL 3490790, at *5 (D.D.C. Dec. 1, 2006); *accord, Bevis*, 801 F.2d at 1390 (rejecting categories that gave "absolutely no indication of the substance of the information contained" and identified some categories "only as 'teletypes,' or 'airtels,' or 'letters'"). Such "irrelevant" classifications are unacceptable because they provide no basis for a judicial assessment of the agency's assertions. *Bevis*, 801 F.2d at 1390.

## C.    The Functional Categories Stated by the Riewe Declaration Are Inadequate

The SEC's functional categories are inadequate because (1) the SEC did not conduct the required document-by-document review to determine the appropriate categories of documents, and (2) the categories used do not divide the withheld documents into discrete groups that would allow the Court to trace a rational link between the nature of the documents withheld and the alleged likely interference with a prospective enforcement proceeding. *Bevis*, 801 F.2d at 1389; *Crooker*, 789 F.2d at 67.

The Riewe Declaration (SEC Motion Ex. 6) ("Riewe Dec."), does not provide evidence that the SEC has conducted the required document-by-document review of the withheld files in order to rely on the functional category approach. *Bevis,* 801 F.2d at 1389. The Riewe Declaration simply states that Ms. Riewe "reviewed" the documents, but does not go into any detail as to how she reviewed them or in what detail. Riewe Dec. at 3. The Riewe Declaration also impermissibly relies on alleged statements of "all other attorneys who were assigned" to the Mark Cuban investigation who "informed [Riewe] that they have reviewed their withheld documents and that they come within the same two categories." *Id.* These vague assertions that

32

documents were "reviewed" or that the declarant was "informed" the documents were "reviewed" are insufficient to support the SEC's use of the categorical approach to substantiate its reliance on Exemption 7(A).

Although courts have permitted the government to rely on affidavits from persons who supervised processing of FOIA requests instead of requiring affidavits from each person who participated as would otherwise be required by Rule 56(e), *see Carney,* 19 F.3d at 814, the Riewe Declaration fails to even meet that lower standard.  The Riewe Declaration never states that she supervised the actions of "all the other attorneys" ever assigned to the Mark Cuban investigation, and furthermore fails to establish that she or anyone else undertook any reasonable effort to conduct a document-by-document review of the withheld information herself.  Riewe Dec. at 3. In fact, the Riewe Declaration shows that Ms. Riewe does not actually know what documents have been withheld, because Ms. Riewe repeatedly makes the otherwise puzzling reference to "correspondence *(if any)* with the Department of Justice."  *Id.* at 3 (emphasis added).  The use of the phrase "if any" clearly indicates that Ms. Riewe does not precisely know what documents are actually included in the withheld documents.

The Riewe Declaration divides the withheld records into two extremely broad categories that come nowhere near the level of specificity required by the Supreme Court's *Robbins Tire* standard: "Commission Correspondence with Other Government Agencies and Third Parties" and "Internal Commission Documents Including Attorney-Client Privileged and/or Work Product Protected Materials."  By using two such broad and ambiguous categories, the SEC mocks its obligation to actually review the documents withheld and show a rational link between disclosure and articulable harm to an enforcement proceeding.  These categories do not

adequately describe the withheld material and make it impossible to determine any potential nexus between disclosure and any potential harm to an enforcement proceeding.

The first category ("Commission Correspondence") is no more descriptive than the previously disallowed category of "letters." *Bevis*, 801 F.2d at 1390. "Correspondence" does not inform a court what kind of information is contained in the withheld documents, and thus cannot allow the Court to determine whether any articulable harm would result from disclosure. The Riewe Declaration states that this category of documents includes "among other things" document requests and subpoenas sent to third parties, yet provides no evidence of what articulable harm could possibly result from disclosing such third party subpoenas and document requests. *Id.*

Further, the Riewe Declaration contains only conclusory statements regarding how disclosure of this inadequately described information would interfere with an enforcement proceeding. For example, with respect to the first category, the Riewe Declaration simply states that "voluntary document requests and subpoenas sent to third parties" are included in the first overly broad category, but it is impossible to determine from the declaration how disclosure of subpoenas and document requests to third parties could possibly interfere with the SEC's civil enforcement proceeding against Plaintiff. Riewe Dec. at 3. The Riewe Declaration seems to argue that disclosure of third-party subpoenas and document requests would "reveal development of the Commission's legal strategy," but that mere naked argument does not show that disclosure would result in any harm to the SEC's enforcement proceeding against Mr. Cuban. It is also apparent that if the SEC has already revealed its legal strategy to a third party through a subpoena or other correspondence, it can now have no reason to believe that its legal

strategy remains a secret (indeed, waiver would apply), and thus there is no reason to believe that disclosure of those documents now could possibly interfere with an enforcement proceeding.

In fact, as the SEC admits, the *SEC v. Cuban* enforcement proceeding it brought against Mr. Cuban in November 2008 was dismissed by the trial court last year, and the SEC has now briefed its appeal of that decision.  In other words, the SEC has already filed its complaint and fully briefed its legal theories in response to a motion to dismiss in that proceeding and on appeal.  Thus, the Court may assume that the SEC's strategy has already been fully revealed, and that no possible harm could possibly result from revealing to whom the SEC sent subpoenas or document requests before the SEC filed its complaint in *SEC v. Cuban*.  In short, the Riewe Declaration does not describe, and thus does not allow the Court to determine, any rational link between any alleged harm and the overbroad, inadequately described category of information.

The second category ("Internal Commission Documents") is no less broad than the first, and no more useful in allowing the Court to determine if any possible articulable harm could result from disclosure.  The Riewe Declaration generally describes this category of documents as internal memoranda and communications, privileged materials, and work product-protected materials, and alleges that disclosing this material would reveal the SEC's "legal strategy and its attorney's thought processes, including the strengths and weaknesses of its case."  But this litigation advantage is not the kind of harm Exemption 7(A) is intended to guard against.  Exemption 5, not Exemption 7(A), covers privileges that would arise in the civil discovery context.  *Goodrich Corp. v. U.S. EPA*, 593 F. Supp. 2d 184, 193-94 (D.D.C. 2009).  "[A] conclusion that a civil litigation (or discovery) advantage potentially realized by the production of a document is enough to warrant protection under Exemption 7(A) would risk unbounded expansion of that law enforcement exemption."  *Id.* at 194.  Use of the more appropriate

Exemption 5 for these allegedly privileged documents, however, would require the SEC to index and describe the withheld documents in order to justify its exemption claim, instead of using the more liberal categorical approach allowed by Exemption 7(A).   By improperly claiming Exemption 7(A) for these documents, the SEC is clearly attempting to avoid its statutory obligations under FOIA.

## IX.    THE SEC WAIVED ITS BLANKET EXEMPTION UNDER THE PRIVACY ACT BY FAILING TO COMPLY WITH ITS OWN REGULATIONS

The SEC argues that its regulations exempt its OIG and Enforcement Division investigative records from the access provisions of the Privacy Act.   Yet for seven months, the SEC utterly ignored those same regulations that it now attempts to hide behind.   The SEC received Mr. Cuban's proper written Privacy Act request in December 2008, but never responded to, processed, or even acknowledged Mr. Cuban's Privacy Act request until well after this lawsuit was filed.   In fact, the SEC's responses to Mr. Cuban only referenced FOIA and the agency's FOIA regulations (*e.g.*, 17 C.F.R. § 200.80) and never mentioned the Privacy Act or any SEC regulations promulgated under the Privacy Act.   The SEC now attempts to use its previously ignored regulations as a shield to deny Mr. Cuban access to the information the SEC has about him in its files.

The Privacy Act authorizes individuals to bring suit to challenge an agency's refusal to disclose records pertaining to them.   The Privacy Act fosters "the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government." *Darst v. Social Sec. Admin*., 172 F.3d 1065, 1067 (8th Cir. 1999) (citation and internal quotation marks omitted).   The Privacy Act was intended to help individuals gain access to government records about themselves and to correct erroneous information in those records.

*See Blazy v. Tenet*, 194 F.3d 90, 95-96 (D.C. Cir. 1999).  The Privacy Act permits individuals to make a written request for such records for review and copying.

The SEC's own Privacy Act regulations (17 C.F.R. § 200.301 *et seq*.) require that a Privacy Act request be acknowledged in writing within 10 days of the request, and that a response be given within 30 days of receiving the request.  The SEC's regulations further require that if an individual's request for access to records under the Privacy Act is to be denied, the requester must "be notified of that fact and given the reasons why access is being denied."  17 C.F.R. § 200.304(c).  The SEC's regulations also require that an individual denied access to records "also will be advised (1) of his right to seek review by the General Counsel of the initial decision to deny access, in accordance with the procedures set forth in § 200.308 of this Subpart; and (2) of his right ultimately to obtain judicial review pursuant to 5 U.S.C. § 552a(g)(1)(A) of a final denial of access by the General Counsel."  *Id.*

Despite the clear mandates of its own regulations, the SEC never acknowledged Mr. Cuban's Privacy Act request, never responded to his Privacy Act request, never informed him that access to his records under the Privacy Act was denied or why access was denied, and never advised him of his right to appeal the SEC's denial of access.  In fact, the SEC did not assert that its own regulations exempted the records sought by Mr. Cuban from the access requirements of the Privacy Act until over one month *after* Mr. Cuban filed this lawsuit seeking access under the Privacy Act.  *See* Winter Dec., Att. J.

It is well-settled that agencies are bound to follow regulations they promulgate.  *Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998).  When agency regulations are "intended to protect the interests of a party before the agency . . . [they] 'must be scrupulously observed.' "  *Id.* (*quoting Vitarelli v. Seaton*, 359 U.S. 535, 547, 79 S. Ct. 968, 976 (1959)

(Frankfurter, J., concurring)).   By refusing to acknowledge, respond, or process Mr. Cuban's Privacy Act request, the SEC blatantly ignored the requirements of the Privacy Act and its own regulations promulgated under the Privacy Act.   Yet, according to the SEC, Mr. Cuban has no remedy for the agency's deliberate violation of the law and disregard of SEC regulations.

However, "courts do have the power to compel agencies to follow their own regulations." *Hill v. Dep't of Air Force*, 844 F.2d 1407, 1412 (10th Cir. 1988).   In this case, given the SEC's deliberate and inexcusable failure to acknowledge, respond to, or process Mr. Cuban's request for access to records under the Privacy Act in contravention of the very regulations on which it now relies, the SEC should be deemed to have waived any blanket Privacy Act exemption it granted to itself under those same regulations, and its Motion for Partial Summary Judgment based on its own Privacy Act regulations should be denied.

## X.   THE SEC'S MOTION DOES NOT COMPLY WITH LOCAL CIVIL RULE 7 AND SHOULD BE DENIED

One last and independent reason the SEC's motion should be denied is the SEC's failure to comply with Local Civil Rule 7(h)(1).   The SEC's Motion and Memorandum of Law in Support both refer to the SEC's "Statement of Material Facts Not in Genuine Dispute," but no such statement accompanied its Motion.   *See* Motion at 1; Memorandum of Law at 2, 4.   Local Civil Rule 7(h)(1) requires every motion for summary judgment "to be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h)(1).   According to this Court's General Order and Guidelines for Civil Cases (the "General Order"), "[a]ny motion or opposition that does not comply with Local Civil Rule 7 . . . will be <u>sua</u> <u>sponte</u> denied."   General Order at ¶ 3 (emphasis in original).

38

In this District, Rule 56 of the Federal Rules of the Civil Procedure is supplemented by Local Civil Rule 7(h)(1), which assists the Court in maintaining docket control and deciding motions for summary judgment efficiently and effectively.  In *Gardels v. CIA,* 637 F.2d 770 (D.C. Cir. 1980), the D.C. Circuit Court of Appeals explained with regard to the predecessor local rule that was virtually identical to Local Civil Rule 7(h)(1):

> Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. The moving party's statement specifies the material facts and directs the district judge and the opponent of summary judgment to the parts of the record which the movant believes support his statement. The opponent then has the opportunity to respond by filing a counterstatement and affidavits showing genuine factual issues. The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record.

*Gardels*, 637 F.2d at 773.  Similarly, in *Twist v. Meese*, 854 F.2d 1421 (D.C. Cir. 1988), the court noted that "a district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact."  *Id.* at 1425.  Of particular significance, the local rule places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record.  *Id.* at 1425; *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 406 (6th Cir. 1992).  In *Jackson v. Finnegan*, 101 F.3d 145 (D.C. Cir. 1996), the D.C. Circuit upheld the district court's order which strictly enforced Local Rule 108(h) (a predecessor rule virtually identical to 7(h)(1)) by striking the plaintiff's deficient statement of undisputed facts and denying plaintiff's request to supplement the statement.  *Id.* at 151.

In *Finnegan,* the D.C. Circuit also emphasized the importance of filing a proper statement of undisputed facts in accordance with the local rule, noting that failure to file a proper statement

"may be fatal to the delinquent party's position."  *Id.* at 152 (*quoting Gardels*, 637 F.2d at 773). The Court of Appeals further warned in *Finnegan* that "[w]hen counsel fails to discharge th[e] vital function" of filing a proper statement of undisputed facts, counsel "may not be heard to complain that the district court has abused its discretion by failing to compensate for counsel's inadequate effort."  *Id.* at 152 (*quoting Twist,* 854 F.2d at 1425).

Therefore, because the SEC has failed to comply with Local Civil Rule 7(h)(1) by filing a statement of material facts as to which it contends there is no genuine issue, and in accordance with *Finegan*, *Gardels*, *Twist*, and this Court's General Order, the SEC's Motion for Partial Summary Judgment should be denied.[10]

## CONCLUSION

Based on the foregoing, the SEC's Motion for Partial Summary Judgment must be denied and Mr. Cuban's Cross-Motion for Summary Judgment, which seeks disclosure of all documents not shown to be exempt, must be granted.

---

[10]  If this Court should nonetheless determine not to so deny the SEC's Motion, Mr. Cuban respectfully submits that the Court should disregard all factual assertions contained in the SEC's Memorandum of Law and regard all facts contained in Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue as admitted.  *See Ladd v. Chemonics Int'l Inc.,* 603 F. Supp. 2d 99, 105 (D.D.C. 2009) (court disregarded all factual assertions contained in the response to movant's statement of material facts because the response did not comply with either LCvR 7(h)(1) or former LCvR 56.1)).

Dated:  February 16, 2010                              Respectfully submitted,


                                                    _____
                                                        /s/ Lyle Roberts

                                                    Lyle Roberts
                                                    D.C. Bar No. 464789
                                                    David M. Ross
                                                    D.C. Bar No. 461733
                                                    DEWEY & LEBOEUF LLP
                                                    1101 New York Avenue, NW
                                                    Washington, D.C. 20005
                                                    Telephone: (202) 346-8000
                                                    Facsimile: (202) 346-8102
                                                    lroberts@dl.com
                                                    dross@dl.com

# APPENDIX OF CITED ON-LINE CASES

## PURSUANT TO
## GENERAL ORDER AND GUIDELINES FOR
## CIVIL CASES ¶ 10 n. 5

Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)
**(Cite as: 1998 WL 164965 (N.D.Cal.))**

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
INSTITUTE FOR JUSTICE AND HUMAN
RIGHTS, Plaintiff,
v.
EXECUTIVE OFFICE OF THE UNITED STATES
ATTORNEY and Immigration and Naturalization
Service, Defendants.
**No. C 96-1469 FMS.**

March 18, 1998.

ORDER DENYING MOTIONS TO DISMISS OR
FOR SUMMARY JUDGMENT OF DEFEND-
ANTS EOUSA AND INS; REMANDING CASE
TO AGENCIES FOR FURTHER PROCEEDINGS

SMITH, J.

**Introduction**

***1** Plaintiff, the Institute for Justice and Human
Rights, has brought a lawsuit under the Freedom of
Information Act ("FOIA"), seeking the release of
files pertaining to the late Bhagwan Rajneesh. De-
fendants, the Executive Office of the United States
Attorney ("EOUSA") and the Immigration and Nat-
uralization Service ("INS"), denied plaintiff's docu-
ment requests, asserting that the release of the in-
formation could interfere with pending law enforce-
ment proceedings and unduly violate privacy. De-
fendants' motions to dismiss or for summary judg-
ment require the Court to determine whether de-
fendants have complied with FOIA procedures and
whether they have established that the withheld in-
formation falls under the claimed exemptions.

**Background**

Since the mid-1980s, plaintiff has been seeking
from various governmental agencies information
related to the late Bhagwan Shree Rajneesh (the
"Bhagwan"). In August 1994, plaintiff sent identic-
al FOIA letters to several agencies requesting the
release of all records relating to the Bhagwan; the
Rajneesh foundation, the Rajneesh Neo-Sannyas In-
ternational Commune ("the commune"), the Ra-
jneesh Investment Corporation, and other related
organizations; the town of Antelope, Oregon; Ra-
jneeshism generally; and Sheela Silverman, a
former follower of the Bhagwan. Those letters have
spawned a total of eight consolidated FOIA cases.
Two of the cases, involving the EOUSA and the
INS, are now before the Court.

In December 1994, the EOUSA denied plaintiff's
request in full, asserting that release of the informa-
tion would interfere with ongoing law enforcement
proceedings. The INS provided some documents,
but refused to provide others, claiming that they
were exempt from disclosure both because the dis-
closure would interfere with ongoing law enforce-
ment proceedings and because it would "constitute
an unwarranted invasion of personal privacy."

At the time the requests were denied, several crim-
inal actions against former followers of the Bhag-
wan were pending in federal court. These criminal
actions arose out of investigations against members
of the commune dating back to the early 1980s. An
investigation into immigration fraud began in 1981
and culminated with multiple indictments in 1985.
By 1994, the government had obtained seven con-
victions, but was still seeking to extradite one de-
fendant, Phyllis McCarthy, who had fled to South
Africa. The government also obtained twelve con-
victions for wiretap conspiracy, but nine defendants
remained at large. Finally, in 1990, seven members
of the commune were indicted on charges of con-
spiracy to murder the United States Attorney in
Oregon. By 1994, two indicted defendants and one
unindicted defendant had pled guilty and the trial of
two others was about to begin.

After his FOIA request was denied, plaintiff first

Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)
**(Cite as: 1998 WL 164965 (N.D.Cal.))**

brought an administrative appeal, and then abandoned that appeal to file this lawsuit on May 3, 1996. In the time between the agency denial and this hearing, Susan Hagan and Sally-Anne Croft have been tried and convicted of conspiracy to commit murder; their convictions were affirmed by the Ninth Circuit in September 1997. *See United States v. Croft,* 124 F.3d 1109 (9th Cir.1997). Three murder conspiracy defendants-Sheela Silverman, Ann Phyllis, and Jane Stubbs-remain at large, as do nine wiretap defendants and the one remaining immigration fraud defendant.

## Discussion

### I. Legal Standard

#### A. Motion to Dismiss

**\*2** A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *See North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir.1983). Dismissal of an action pursuant to Rule 12(b)(6) is appropriate only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1482 (9th Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *See North Star,* 720 F.2d at 580. Legal conclusions need not be taken as true merely because they are cast in the form of factual allegations, however. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

#### B. Motion for Summary Judgment

To withstand a motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue of material fact in dispute. *See* Fed.R.Civ.P. 56(e). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

#### C. Freedom of Information Act

The Freedom of Information Act requires that agencies make their records available to the public upon request. 5 U.S.C. § 552(a). Under Exemption 7(A), however, agencies may withhold "records or information compiled for law enforcement purposes" the release of which "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The government must prove the possibility of interference by something "more than a conclusory statement." *Campbell v. Department of Health & Human Serv.,* 682 F.2d 256, 259 (D.C.Cir.1982). Under Exemption 7(C), agencies may withhold law enforcement records the release of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

The government bears the burden of establishing that these exemptions apply. 5 U.S.C. § 552(a)(4)(B). In determining what documents to withhold, the government must review each document individually. *See Bevis v. Department of State,* 801 F.2d 1386, 1389 (D.C.Cir.1986). It need not justify a 7(A) withholding on a document-by-document basis, however; instead, it may do so by category. *See Crocker v. Bureau of Alcohol, Tobacco and Firearms,* 789 F.2d 64, 67 (D.C.Cir.1986). The categories must be functional, allowing "the court to trace a rational link between

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)
**(Cite as: 1998 WL 164965 (N.D.Cal.))**

the nature of the document and the alleged likely interference." *Id.* When the government justifies its 7(A) withholdings by category, it need not prepare a *Vaughn* index, a procedure normally required in order to allow the Court to determine how the release of each individual document would qualify under the exception. *See Lewis v. Internal Revenue Service,* 823 F.2d 375, 380 (9th Cir.1987) (*Vaughn* index would be futile under such circumstances).

**\*3** The Court reviews *de novo* an agency decision to withhold a document. *See Bonner v. Dept. of State,* 928 F.2d 1148, 1152 (D.C.Cir.1991). The correctness of the decision "ordinarily must be evaluated as of the time it was made." *Id.* Finally, in evaluating the applicability of Exemption 7(A), the Court must "weigh the strong presumption in favor of disclosure" against the likelihood of interference. *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 236, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978).

## II. Analysis

### A. EOUSA Documents

Apparently conceding the government's need to withhold information about the murder case, plaintiff states that it only seeks information relating to the immigration fraud proceeding against the Bhagwan. Plaintiff objects to the government's withholding of that information for several reasons. First, plaintiff attacks the government's general theory for exclusion, contending that the release of the immigration information could not have interfered with the murder proceedings at the time the request was denied in 1994, and could not interfere with it now. Plaintiff also contends that the government failed to follow appropriate FOIA procedures in reviewing the documents and justifying its withholdings.

### 1. General Validity of the 7(A) Exemption at the Time the Agency Denied the FOIA Request in 1994

The government offers two theories for why the release of those documents would have interfered with ongoing law enforcement proceedings in 1994. It first argues that the release would have interfered with the ongoing extradition proceeding against Phyllis McCarthy on immigration fraud charges. This rationale for exclusion, however, does not appear in the affidavits of the government officials who handled the EOUSA FOIA request. The parties have not addressed the question of whether the government can argue that the withholding of documents was proper for a reason not advanced by the agency at the time it denied the request. Because the case can be resolved without deciding this issue, the Court turns to the government's second theory.

The government also justifies the withholding on the ground that the release of the immigration documents would have harmed the murder prosecution that was ongoing in 1994. The support for this argument is found in the declaration of the Assistant United States Attorney who has handled the murder cases. (Reply Declaration of AUSA Scott J. Glick in Support of INS's Motion to Dismiss ("Glick Decl.").) He asserts that the immigration fraud and murder conspiracy cases are "inextricably intertwined" because the conspirators decided to murder the United States Attorney in order to end the immigration fraud prosecutions, (Glick Decl. at 6), a theory of motive that the Ninth Circuit accepted in upholding the convictions of two conspirators. *See United States v. Croft,* 124 F.3d 1109, 1114 (9th Cir.1997). The district court with jurisdiction over the murder conspiracy indictment, moreover, explicitly ruled in the Croft trial that evidence of immigration fraud was admissible as intrinsic or motive evidence. (Glick Decl. at 6.) The Court therefore agrees with the government that it is at least possible that the release of immigration documents in 1994 could have interfered with the government's ability to prosecute the defendants in the murder conspiracy case.

### 2. General Validity of the 7(A) Exemption Now

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)
**(Cite as: 1998 WL 164965 (N.D.Cal.))**

**\*4** Plaintiff argues that even if the government properly withheld the documents in 1994, its reason for the exemption is no longer valid. This position raises two questions: whether it is proper for the Court to analyze the present validity of the claimed exemption, and whether the result would be different if such an analysis is performed. The Court answers the first question in the affirmative and the second in the negative.

Under District of Columbia Circuit precedent, courts ordinarily evaluate the correctness of an agency's FOIA decision as of the time it was made. See *Bonner v. Dept. of State,* 928 F.2d 1148, 1152 (D.C.Cir.1991). Because no Ninth Circuit case has explicitly adopted the *Bonner* rule, the Court is not bound to follow it. Comparing the facts of *Bonner* to the facts of this case indicates that it would not be sensible to apply *Bonner* here. In *Bonner,* the parties had agreed to use 63 documents as a representative sample to determine whether the overall group of 1,776 documents had been properly withheld. The government then released 19 of the documents, claiming that the security reasons for exemption no longer applied. *Id.* at 1149. The District of Columbia Circuit held that in order to maintain the representative character of the sample, the district court should have evaluated whether the government's original withholding of the documents had been proper. *Id.* at 1152. The plaintiff then argued that because the government had admitted that security needs had changed with regard to the 19 documents, the government should be required to reprocess the entire group of 1,776 documents. The circuit court refused, noting that doing so would defeat the very purpose of using a representative sample. *Id.* at 1153.

The facts of this case are quite different. Although the Court has not been informed of the total number of documents involved, it appears to be far fewer than in *Bonner,* making a new review based on changed circumstances far less burdensome. Unlike in *Bonner,* the government admits that the circumstances underlying the withholding have in fact

changed. *Bonner* appears to contemplate that where the grounding for the exemption has plainly changed, it is appropriate to review the agency decision in light of the new circumstances. The *Bonner* court gave the example of the publication of a document after the decision to withhold it. *Id.* at 1153 n. 10. The termination of law enforcement proceedings that formed the basis of an exemption would be an equally apparent and substantial change in circumstances. Accordingly, the government should be required to justify its withholdings based on present circumstances in this case.

The government's general theory for its Exemption 7(A) withholdings, however, is equally valid today as it was in 1994. Although convictions have been obtained against several of the immigration fraud defendants and against several of the murder defendants in the past four years, there are defendants in both cases who remain fugitives. Because both cases appear to be still open, the changed circumstances do not mandate a different result. See *Manna v. United States Dep't of Justice,* 51 F.3d 1158, 1164-65 (3d Cir.1995) (Exemption 7(A) covers both pending and "prospective" criminal proceedings).

**\*5** As a fallback position, plaintiff claims he should be allowed to amend his complaint to include a new FOIA request, filed with the EOUSA in November 1996, seeking the same information. That document request, and an administrative appeal from it, have been denied. The government responds that the Court cannot exercise jurisdiction over those claims because the statutory time limit on plaintiff's administrative appeal has passed. Because the Court holds that the government must apply its exemptions based on current facts, it need not decide whether to allow plaintiff to file an amended complaint.

### 3. Improper Categories

Even though the government has shown that the release of immigration documents could possibly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)
**(Cite as: 1998 WL 164965 (N.D.Cal.))**

compromise ongoing law enforcement proceedings, the government must still justify its withholdings of particular documents. In this case, the government exercised its right to do so on a category-by-category basis. *See Crooker v. Bureau of Alcohol. Tobacco and Firearms,* 789 F.2d 64, 67 (D.C.Cir.1986). The government asserted that "Categories of documents contained in this [criminal case] file include those relative to the following: a confidential informant; other agency reports; wiretap transcripts and log book; co-defendant extradition documents; Grand Jury transcripts; and, attorney work product." (Declaration of Tammy Haimov in Support of EOUSA's Notice of Motion to Dismiss ("Haimov Decl.") at 5.)

Plaintiff argues these categories are too general. To be appropriate, a category must be "functional," *Bevis v. Department of State,* 801 F.2d 1386, 1389 (D.C.Cir.1986), enabling the Court to determine whether all the documents in the category would interfere with the claimed interest. In *Bevis,* the FBI withheld several categories of documents from a FOIA request on the ground that they would interfere with an ongoing investigation in El Salvador. The District of Columbia Circuit approved the use of some of the categories-"the identities of possible witnesses and informants," "reports on the location and viability of potential evidence," and "polygraph reports"-because they "define [d] the nature of the information contained in the included documents" and allowed the court to decide how such documents would interfere with the law enforcement proceedings. *Id.* at 1390. The court rejected several other categories-"teletypes" and "letters"-because there was no way to determine from them whether the included documents would interfere. *Id.*

Four of the six categories asserted by the EOUSA are similarly problematic. The Court has no way of determining whether the release of "agency reports" would interfere with the ongoing prosecutions; it depends on the subject matter of the reports. Information about the identity of a confidential informant would plainly interfere with ongoing

law-enforcement proceedings, but that is not necessarily true of all documents related to "a confidential informant." Likewise, it is not apparent to the Court why the release of all "attorney work product" or "co-defendant extradition documents" would necessarily interfere with the pending prosecutions. The other two categories, "wiretap transcripts and log book" and "Grand Jury transcripts," are acceptable. To comply with FOIA, the government must recast the categories "a confidential informant," "other agency reports," "co-defendant extradition documents," and "attorney work product" so that they comply with the *Bevis* requirement and must submit affidavits explaining why all documents in the new categories would interfere with the pending proceedings or otherwise be exempt from disclosure. *See Bevis* at 1390 (ordering additional affidavits to support categories).

## 4. Failure to Undertake Document-by-Document Review

**\*6** Plaintiff argues that the government's declarations do not establish that a document-by-document review occurred. FOIA law requires that the agency review each document in order to place it in its proper category. *See Bevis v. Department of State,* 801 F.2d 1386, 1389 (9th Cir.1986). "Absent such individual scrutiny, the categories would be no more than smaller versions of the 'blanket exemptions' disapproved by Congress in its 1974 amendment of FOIA." *Id.* (citing *Crooker,* 789 F.2d at 67). The declarations in this case do not establish that each document was reviewed in order to place it in the correct category. Instead the declarations contain only general statements such as "The entire case file pertained to a criminal prosecution." (Declaration of Bonnie L. Gay in Support of EOUSA's Motion to Dismiss ("Gay Decl.") at 7.) Based on the government's declarations, neither the Court nor plaintiff can be confident that all the documents contained in the files fall into the categories asserted by the government. To comply with FOIA, the EOUSA must conduct a document-by-document review and provide affidavits attesting that the re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)
**(Cite as: 1998 WL 164965 (N.D.Cal.))**

view took place.

## B. INS Documents

Plaintiff seeks the same information from the INS as from the EOUSA. The INS granted plaintiff's request in part and denied the rest based on three exemptions: 7(A), law enforcement information the release of which would interfere with a pending law enforcement proceeding; 7(C), law enforcement information the release of which could reasonably be expected to constitute an unwarranted invasion of privacy; and (6), personnel and medical files "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(6), (7)(A) & (C). The parties raise the same arguments about whether the immigration information could tend to interfere with the ongoing murder conspiracy proceedings; for the reasons expressed above, the Court agrees with the government that that possibility exists.

The INS case is different from the EOUSA case, however, because on February 27, 1997, the INS served five *Vaughn* indexes on plaintiff. Three of those indices listed documents referred to the INS in early 1997 from the State Department and the FBI. (INS's List of Five Vaughn Indexes in Support of its Motion to Dismiss ("List of Vaughn Indexes"), Ex. T-V.) The fourth index dates back to 1985. (List of Vaughn Indexes, Ex. X.) The fifth index, although undated, appears to have been created before 1990, as a handwritten note on it reads "Public Reading Room, 1/90." (List of Vaughn Indexes, Ex. Y.) The fourth and fifth indices both cover documents dated between 1981 and 1984.

Much of plaintiff's brief is devoted to arguments challenging the usefulness of the two old *Vaughn* indices. The government responds by arguing that under Exemption 7(A) it is not required to provide *Vaughn* indices at all, and may instead demonstrate the need for withholding on a category-by-category basis. This is correct as a statement of law. *See Crooker v. Bureau of Alcohol, Tobacco and Fire-*

*arms,* 789 F.2d 64, 67 (D.C.Cir.1986). In this case, however, the government has not provided any categories. Having instead chosen to provide *Vaughn* indices, the government now has no choice but to use them to support its 7(A) exemptions. The government, moreover, does not have the option of categorically justifying its 6 and 7(C) exemptions, *see Wiener v. FBI,* 943 F.2d 972, 977-79 (9th Cir.1991) , and so was required to provide the *Vaughn* indices to support its 6 and 7(C) privacy claims.

**\*7** The fourth and fifth indices are far out of date and must be revised. The decade-old statements in those indices that the release of the documents would interfere with "pending" or "ongoing" proceedings do not convey useful information. Moreover, the people whose privacy was being protected by the 6 and 7(C) exemptions may have since died or consented to the release of the information. For example, plaintiff argues, and it appears to the Court, that some of the documents were withheld to protect the privacy of the late Bhagwan, who authorized the attorney for plaintiff to receive his files.

Reviewing these documents should not place an undue burden on the government. The two indices list a total of 242 documents, many of which have already been released. In addition, some of the blame for the lengthy delays in this case rests with the government. Under these circumstances, it is not unfair to require the government to ensure that its withholdings are still justifiable. The Court therefore holds that the INS must review and revise the Vaughn indices in exhibits X and Y so that they reflect current information.

### Conclusion

For the reasons expressed above, the Court DENIES the EOUSA's and the INS's motions for summary judgment and to dismiss, and ORDERS that

(1) the EOUSA recast its categories "a confidential

Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)
**(Cite as: 1998 WL 164965 (N.D.Cal.))**

informant," "other agency reports," "co-defendant extradition documents," and "attorney work product" and submit affidavits explaining why all documents in the new categories would interfere with the pending proceedings or otherwise be exempt from disclosure;

(2) the EOUSA conduct a document-by-document review and provide affidavits attesting that the review took place; and

(3) the INS review and revise the Vaughn indices in exhibits X and Y so that they reflect current information.

Because the Court did not rely on the portions of plaintiff's declarations challenged by the government, the EOUSA's motion to strike is DENIED as moot.

SO ORDERED.

N.D.Cal.,1998.
Institute For Justice and Human Rights v. Executive Office of U.S. Attorney
Not Reported in F.Supp., 1998 WL 164965 (N.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

H

United States District Court,
N.D. California.
LAWYERS COMMITTEE FOR CIVIL RIGHTS
OF the SAN FRANCISCO BAY AREA, Plaintiff,
v.
UNITED STATES DEPARTMENT OF the
TREASURY, Defendant.
**No. C 07-2590 PJH.**

May 11, 2009.

West KeySummary
**Records 326 ⚖═62**

326 Records
326II Public Access
326II(B) General Statutory Disclosure Requirements
326k61 Proceedings for Disclosure
326k62 k. In General; Request and Compliance. Most Cited Cases

The United States Department of the Treasury was ordered to disclose questionnaires and any responses to the questionnaires as part of a request made pursuant to the Freedom of Information Act (FOIA). The Treasury refused to disclose the questionnaires, contending that they were supplemental correspondence which were not part of delisting petitions as requested by an association of lawyers. Liberally construing the FOIA requests, the questionnaires which were sent as a follow-up to initial applications, constituted a "response" as specified by the FOIA requests. 5 U.S.C.A. § 552.

Thomas R. Burke, Davis Wright Tremaine, LLP, Philip Kim Hwang, Robert Rubin, Lawyers' Committee for Civil Rights of the San Francisco Bay, San Francisco, CA, Lissa Wolfendale Shook, Seattle, WA, for Plaintiff.

Peter T. Wechsler, United States Depsrtment of Justice, Washington, DC, for Defendant.

**ORDER RE: SUPPLEMENTAL ISSUES**

PHYLLIS J. HAMILTON, District Judge.

**\*1** Currently before the court are two issues that have arisen following the court's September 30, 2008 order denying defendant's motion for summary judgment, and its November 25, 2008 clarification order. Pursuant to the court's April 6, 2009 minute order following a telephonic conference, on April 13, 2009, defendant United States Department of the Treasury ("Treasury") filed its brief (which it refers to as a "status report"). It also filed a declaration from Marshall H. Fields, Jr., an assistant director at Treasury's Office of Foreign Assets Control ("OFAC"), a Vaughn index, and numerous redacted delisting petitions. On April 20, 2009, plaintiff Lawyers Committee for Civil Rights of the San Francisco Bay Area ("LCCR") filed a response and a declaration from Thomas Burke, LCCR's counsel. Having reviewed the parties' papers and the relevant legal authorities, the court rules as follows.

**DISCUSSION**

The two issues currently before the court are:

(1) whether the identities and other identifying information of delisting petitioners may be redacted pursuant to exemptions 7(A) and 7(F) of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7)(A) & (F); and

(2) whether questionnaires provided by Treasury to petitioners submitting delisting petitions should be disclosed pursuant to LCCR's FOIA requests.

**A. Questionnaires**

On February 14, 2008, the court issued its order granting in part and denying in part Treasury's first motion for summary judgment and denying LCCR's motion for discovery. The court required Treasury

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

to disclose certain documents as responsive to LCCR's FOIA requests nos. 5 and 6, which asked for records regarding:

(5) The number and nature of complaints from individuals whose names were flagged as similar to a name on the SDN list or other watchlist and any OFAC responses to such complaints;

(6) The number and nature of complaints from individuals whose credit reports contained an alert regarding a possible name match to the SDN list or other watchlist, and any OFAC responses to those complaints.

Among the documents that the court ordered disclosed were "delisting petitions," which Treasury represented were applications in paper form filed by individuals acknowledging that their names were on the SDN list and seeking to remove their names from the SDN list.

Following the February 14, 2008 order, Treasury filed another motion for summary judgment claiming that it was entitled to withhold the delisting petitions in their entirety pursuant to eight FOIA exemptions: 2, 3, 4, 6, 7(A), 7(C), 7(D), and 7(F). In that motion, Treasury attempted to reargue the court's conclusion that LCCR was entitled to the delisting petitions, an issue the court declined to reconsider in its September 30, 2008 order denying Treasury's second motion for summary judgment. FN1

> FN1. The court rejected Treasury's argument that LCCR was not entitled to the delisting petitions because its FOIA request and complaint targeted only "false matches" or mistakes with respect to the SDN list, and that the delisting petitions are "in fact *not* communications concerning a false match, but are instead "applications *acknowledging* that persons *are included* on the SDN list and requesting that their names be removed."

Throughout the case, the court has experienced a fair amount of difficulty ascertaining the scope of and obtaining a "complete" delisting petition from Treasury. As detailed in the court's September 30, 2008 order, after the July 23, 2008 hearing, the court took the motion under submission, and ordered Treasury to submit three randomly selected delisting petitions in order to ascertain whether certain delisting petitions submitted by LCCR in conjunction with its opposition to the motion were representative of delisting petitions generally. Specifically, the court ordered Treasury to submit three delisting petitions, including the first petition belonging to an applicant with a name beginning with "A," the last applicant with a name beginning with "N," and the first applicant with the name beginning with "R."

**\*2** Treasury submitted the petitions, which were not disclosed to LCCR, to the court on July 29, 2008. The "petitions" each consisted of one-page letters from individuals to OFAC, and were very dissimilar to the exhibits rovided by LCCR. They appeared to the court to be incomplete. Additionally, it was apparent to the court that Treasury had misunderstood its request to provide sample petitions by erroneously limiting the petitions submitted to the court to *individual*-as opposed to entity-applicants. Accordingly, on July 31, 2008, during a further telephonic conference with the parties, the court clarified that its request pertained to petitions submitted by *entities* as well as individuals. The court ordered Treasury to submit three random *entity* delisting petitions, including the first entity with the name beginning with "A," the last entity with the name beginning with "N," and the first entity with the name beginning with "R."

The court also requested that Treasury confirm that the July 29, 2008 submissions that it provided the court constituted "complete petitions," and to update those petitions as necessary. It clarified that the single letter submitted by Treasury was not sufficient, and that it viewed the delisting petitions to also include attachments and exhibits to the letters

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

submitted. FN2

> FN2. Accordingly, on August 6, 2008, Treasury submitted three additional delisting petitions from entities. One of those delisting petitions similarly consisted of a one-page letter to OFAC. Although that sample suggests prior related correspondence, Treasury stated that "no [supporting] documents accompanied" that delisting petition. Treasury also confirmed that there were no supporting documents for the individual delisting petitions that it submitted July 29, 2008.

> Treasury did, however, submit supporting documents for the remaining two entity delisting petitions. The majority of those documents were untranslated, and appeared to be in German and/or Russian. Accordingly, the court, fluent in neither, was unable to ascertain the contents of the untranslated documents.

In the course of the post-September 2008 disclosures, Treasury revealed to LCCR that after receiving a delisting petition, it sometimes subsequently forwards a "questionnaire" to the petitioner, seeking supplemental information. Specifically, the Fields declaration explains:

In many cases, after OFAC receives a delisting petition, [it] will send a written request that the petitioner submit supplemental information to assist OFAC in making a determination regarding the delisting petition. Although this request is sometimes referred to as a 'questionnaire,' it is a letter specifically tailored to account for the circumstances of each petitioner's designation. In certain cases there may be subsequent exchanges of information between OFAC and a petitioner.

Fields Decl. ¶ 24.

Treasury refuses to disclose the questionnaires, contending that it does not consider "such supple-mental correspondence" to be part of the delisting petition. *Id.* It also does not consider the questionnaire to be a "response" to the petition, but contends that a "response" is the actual letter that grants or denies the petition. *Id.* LCCR responds that Treasury continues to change the definition of a delisting petition throughout the course of the case, and that liberally construed, its FOIA requests cover the questionnaires.

Liberally construing LCCR's FOIA requests nos. 5 and 6, the court finds that the questionnaires, which are sent as a follow-up to the initial application submitted by the petitioner, constitute a "response" as specified by the FOIA requests. *Truitt v. Dep't of State,* 897 F.2d 540, 544-45 (D.C.Cir.1990); *Zemansky v. United States EPA,* 767 F.2d 569, 571 (9th Cir.1985). Additionally, any subsequent petitioner responses to the questionnaires constitute a part of petitioner's "complaint," which this court has construed to include delisting petitions. This is in spite of the fact that Treasury continues to remind the court that LCCR's FOIA requests nos. 5 and 6 request "complaints" not "delisting petitions," and that it continues to argue for a narrow construction of these requests. Notwithstanding LCCR's inartfully crafted FOIA requests, the court has already liberally construed the requests to include delisting petitions, and having done so, also liberally construes the requests to include the questionnaires and any responses. For these reasons, Treasury is ordered to disclose the questionnaires and any responses to the questionnaires as well.

## B. Exemption 7(F): Endangering Life or Physical Safety

**\*3** Exemption 7(F) includes records or information compiled for law enforcement purposes, "but only to the extent that the production of such law enforcement records or information could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). In its September 30, 2008 order, the court noted that unlike the other section 7 exemptions, there is a dearth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

of circuit law, Ninth Circuit or otherwise, regarding exemption 7(F). It however found another district court case on the issue persuasive, and noted that it is clear that in order to qualify for the 7(F) exemption, an agency must establish *non-conclusory* reasons why disclosure of a category of withheld documents would reasonably be expected to endanger the life or physical safety of any individual. *See Los Angeles Times Communications, LLC v. Department of Army,* 442 F.Supp.2d 880, 898-900 (C.D.Cal.2006) (emphasis added). Accordingly,

[t]he test is not whether the court personally agrees in full with the [agency's] evaluation of the danger-rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the [Agency] is expert and given by Congress a special role.

*Id.*

Existing authority supports categorical application of the Exemption 7 subsections. *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 235-36, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (allowing categorical application of Exemption 7(A) to witness statements obtained by the NLRB in conjunction with its investigation of defendant's alleged unfair labor practices following a contested representation election); *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 777-79, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) (concluding that a categorical approach was appropriate for Exemption 7(C) as well as 7(A), and holding that rap sheets could be categorically withheld under 7(C)); *United States Dep't of Justice v. Landano,* 508 U.S. 165, 178-180, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993) (suggesting that Exemption 7(D) may also be applied categorically); *see also Lewis v. IRS,* 823 F.2d 375, 378 (9th Cir.1987) (involving Exemption 7(A)); *Lion Raisins v. United States Dep't. of Agriculture,* 354 F.3d 1072, 1079 (9th Cir.2004); *In re Department of Justice,* 999 F.2d 1302, 1308 (8th Cir.1993) (discussing pertin-

ent Supreme Court cases).

It is Treasury's burden to demonstrate that an exemption may be applied categorically, or to a class of documents. *Bevis v. Dept. of State,* 801 F.2d 1386, 1389 (D.C.Cir.1986); *see also In re Department of Justice,* 999 F.2d at 1309 (discussing *Bevis* and *Robbins Tire,* 437 U.S. at 235-36). In order to apply an exemption categorically, there must be some indicia that the individual documents within the class of documents are similar; and that the agency has reviewed and ensured that the individual documents it seeks to include in the class of documents are indeed similar. *See id.; see also Campbell v. Dept. of Health & Human Services,* 682 F.2d 256, 265 (D.C.Cir.1982); *Institute for Justice v. Executive Office,* 1998 WL 164965 at *5-7 (N.D.Cal.1998). In its September 30, 2008 order, the court noted that numerous courts have held, and that it agrees, that proper utilization of the categorical approach requires the agency to: (1) define functional categories of documents; (2) conduct a document-by-document review to assign documents to proper categories; and (3) explain to the court how release of *each category* would interfere with enforcement proceedings. *Id.; accord* James T. O'Reilly, Federal Information Disclosure § 7:18 (2000 ed. & 2008 suppl.). Thus, "although [an agency] need not justify *its withholding* on a document-by-document basis in court, the [agency] must itself review each document to determine the category to which it properly belongs." *Bevis,* 801 F.2d at 1389-90).

**\*4** Treasury's Vaughn index confirms that Treasury has asserted Exemption 7(F) to withhold names, addresses, telephone numbers, dates of birth, and other identifying information from almost all of the delisting petitions. Although Treasury did not provide the court with specific numbers, it appears from the court's review that it has asserted Exemption 7(F) with respect to at least 125 of the 166 delisting petitions listed in its Vaughn index.[FN3] Presumably because of the number of petitions for which it has asserted 7(F), Treasury has not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

provided the court with all of the delisting petitions for which the exemption has been asserted, but instead has submitted four "sample" petitions, Vaughn index nos. 82, 97, 118, and 134.[FN4]

> **FN3.** LCCR states that Treasury has actually asserted 7(F) with respect to 87.7% or 129 out of 147 petitions. *See* Response at 2.

> **FN4.** Treasury failed to provide the court with the corresponding numbers on the Vaughn index for *any* of the petitions that it submitted to the court. In the future, to the extent that Treasury submits delisting petitions as exhibits, it is required to provide the court with the corresponding Vaughn index number.

Treasury argues that it is entitled to redact the identities and identifying information under Exemption 7(F) because the petitioners were either designated pursuant to OFAC's narcotics-trafficking programs or otherwise cooperated with the government in sensitive law enforcement or national security investigations. Fields Decl. at ¶¶ 34-38. It notes that releasing the identities and identifying information, given past harassment, murders, and attacks, could reasonably be expected to endanger the life or physical safety of petitioners. *Id.*

LCCR counters that Treasury fails to identify with reasonable specificity the persons who would be endangered by release of the information, let alone the precise manner in which such persons would be endangered. It argues that Treasury is simply making the same arguments that the court previously rejected with respect to its categorical assertion of 7(D), and that its 7(F) "cooperation" argument is simply an "end-run" around the heightened proof requirements of Exemption 7(D). It asserts that Treasury has simply abandoned its prior 7(D) arguments given the particularized showing required for that exemption, *see Landano,* 508 U.S. at 181, and "dressed up" the 7(D) arguments under 7(F).

LCCR argues that the Fields declaration is insufficient under *either* 7(D) or 7(F) because it fails to provide anything more than general or categorical claims that the numerous delisting petitioners are informants or confidential sources. LCCR suggests that Fields was required to provide information on a petition-by-petition basis. LCCR further argues that Fields does not explain how he obtained the information that the affected delisting petitioners were covered by 7(F).

Previously, regarding Exemption 7(F), Treasury submitted the Fifth Canter Declaration, which provided in pertinent part:

> The release of the delisting petitions would reasonably be expected to expose individuals (including the applicant but also other individuals who have provided statements and/or other information pursuant to a delisting petition or are mentioned in the petition) to threats against their life and would endanger their physical safety. Such danger is presented by the mere fact that an individual applied for delisting as others may infer by such action that such individual has provided information related to his or her associates.

**\*5** Cantor Decl. ¶ 58.

In its September 30, 2008 order, the court concluded that Treasury had not demonstrated that it was entitled to categorically withhold the delisting petitions under any of the exemptions, including 7(F). Specifically, the court found that

> Treasury ... failed to make an appropriate showing entitling it to categorical withholding. Treasury has failed entirely to define functional categories of documents. Treasury itself admits that, at a minimum, there are different sub-categories of delisting petitions, for example, open versus closed petitions. However, Treasury failed to show that open and closed delisting petitions functionally belong to the same category. *See Bevis,* 801 F.2d at 1389-90. Moreover, the court further finds that Treasury has not shown that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

delisting petitions as a whole-whether open *or* closed-functionally belong to the same category. The delisting petitions reviewed by this court, both with LCCR's opposition to the summary judgment motion and pursuant to this court's order following the hearing, varied significantly, thus defying any conclusion that categorical withholding of the petitions is appropriate, regardless of whether they are open or closed.

Moreover, not only did Treasury fail to define functional categories of documents, but it also admittedly did not review all of the delisting petitions that it seeks to withhold to ensure that they were properly categorized. *See id.* In fact, it explains that it reviewed only 102 of the 346 petitions to determine which exemptions applied to the documents. *See* 5th Canter Decl. at ¶ 24. This simply is not sufficient to enable Treasury to conclude that the other 244 petitions should fall into the same category as the 102 that it reviewed. *See Bevis,* 801 F.2d at 1389-90.

September 30, 2008 Order at 15-16.

The court further found that even if Treasury could categorically withhold the documents under 7(F), the Fifth Canter Declaration did not adequately demonstrate that Treasury was entitled to withholding under 7(F). It found the Canter declaration to include conclusory, unsupported speculation, and held that Treasury was required, but had failed, to provide the court with sufficient information to understand the basis for its conclusion regarding 7(F).

Treasury's current brief and supporting documents differ in several significant ways from its prior papers and position. First, it is not seeking to withhold entire documents under 7(F), but has segregated out the information that it contends is exempt under 7(F)-the identities and other identifying information of petitioners. *Cf.* September 30, 2008 Order at 20-22. Second, Treasury has provided the court with a Vaughn index.

Third, Treasury has made the type of showing re-

quired for categorical withholding under 7(F). The functional category includes those delisting petitions from petitioners who were designated pursuant to OFAC's narcotic's trafficking program or who cooperated or provided sensitive information to the U.S. government. Fields Decl. ¶ 34. Contrary to its prior summary judgment papers, the Vaughn index that Treasury has now provided to the court also confirms that it has conducted a document-by-document review to ensure that only those delisting petitions satisfying the above criteria are placed in this particular category. Finally, as discussed below, Treasury has adequately explained why the redaction of identifying information in the above category of documents is appropriate under 7(F).

**\*6** Unlike the prior Canter declaration, the court finds that the current Fields declaration provides sufficient *non-conclusory* reasons why disclosure of the identities and identifying information from delisting petitions authored by petitioners who were designated pursuant to OFAC's narcotics trafficking program or who cooperated or provided sensitive information to the U.S. government could reasonably be expected to endanger the life or physical safety of any individual under 7(F).

With respect to the potential danger or harm, Fields explains that such petitioners may be associated with "individuals and entities ... involved in violent activities," and that release of their identities exposes them "to a risk of reprisal by members of violent organizations who suspect[ ] that the petitioners provided information regarding the organization or associates." Fields Decl. at ¶ 36. Fields further describes the individuals and organizations as "sophisticated and ruthless," and notes that they "will potentially assassinate any person they perceive to threaten the organization's interests." *Id.* In terms of the likelihood of such danger, Fields attests that "OFAC is aware that criminal narcotics organizations and their members closely track the SDN list." *Id.* at ¶ 38.

For the above reasons, the court concludes that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

Treasury is entitled to categorically redact under Exemption 7(F) the identities and other identifying information of petitioners who were designated pursuant to OFAC's narcotics trafficking program or who cooperated or provided sensitive information to the U.S. government. Because Treasury has demonstrated sufficient harm under 7(F), the court need not consider whether it has met the heightened standard required under Exemption 7(D).

## C. Exemption 7(A): Interference with Enforcement Proceedings

Unlike Exemption 7(F), Treasury has asserted 7(A) with respect to a much smaller number of delisting petitions. It has submitted all nine of the delisting petitions for which it asserts 7(A) as Exhibit B, including Vaughn index nos. 29, 43, 55, 82, 108, 140, 155, 158, and 160. Treasury seeks to redact exactly the same type of information under 7(A) that it does under 7(F)-the petitioner's identity and other identifying information.

Treasury argues that it is entitled to redact such information because it has determined that release of the information "could reasonably be expected to interfere" with pending and ongoing law enforcement investigations or "OFAC's reconsideration process." Treasury then reiterates many of the same arguments that it made in its summary judgment motion, including several that were already rejected by the court in its September 30, 2008 order. Treasury also states that Exemption 7(A) may be applied to a category of documents rather than on a document-by-document basis.

In response, LCCR argues that Treasury's current showing cures none of the deficiencies previously noted by the court with respect to this exemption, and is actually even more conclusory and less-detailed than the prior Canter declaration and related showing.

**\*7** In its September 30, 2008 order, the court set forth its holding regarding Treasury's 7(A) claim,

along with the relevant standards, which continue to apply. That order provides in pertinent part:

There is no dispute that provided an adequate showing, exemption 7(A) may indeed apply categorically to a class of documents. As noted above, in *Robbins Tire,* the Supreme Court recognized that exemption 7(A) could be invoked categorically. In so holding, it stated that "Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings, disclosure of *particular kinds* of investigatory records while a case is pending would generally 'interfere with law enforcement proceedings.' " 437 U.S. at 236 (emphasis added); *accord John Doe,* 493 U.S. at 156 (quoting *Robbins,* 437 U.S. at 224) ("Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it came time to present their cases .).

The categorical application issue, however, is distinct from the type of showing that Treasury is required to make to demonstrate that Exemption 7(A) applies to the delisting petitions generally. In order to withhold documents pursuant to 7(A), the agency must establish "that disclosure of those documents would interfere with pending enforcement proceedings." *Lion Raisins,* 354 F.3d at 1081-82 (quoting *Lewis,* 823 F.2d at 379). The Ninth Circuit has held that the agency must explain "*in detail ...* how releasing each of the withheld documents would interfere with the government's ongoing criminal investigation." *Id.* at 1084 (emphasis added). "The submission must provide as much factual support for [the agency's] position as possible without jeopardizing the government's legitimate law enforcement interest in withholding the documents, and it must be 'detailed enough for the district court to make a de novo assessment of the government's claim of exemption.' " *Id.* (quoting *Maricopa Audubon Soc'y,* 108 F.3d at 1092).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

In *Lion Raisins,* the Ninth Circuit reversed the district court where the plaintiff, an independent handler of California raisins, sought to under FOIA, documents related to the USDA's criminal investigation of it. The USDA withheld investigative reports prepared by the Agricultural Marketing Services of the USDA ("AMS") and the Office of the Inspector General ("OIG") under Exemption 7(A). The district court granted summary judgment to the USDA, and the Ninth Circuit reversed and remanded to the district court with instructions to require submission of detailed public declarations, testimony, or other material in support of its claim that Exemption 7(A) applied to the documents. *Id.* at 852. The court held that the sole affidavit from the AUSA in support of the USDA's claimed exemption was not sufficient. *Id.; see also* Lewis, 823 F.2d at 378 (generalized affidavits are not sufficient to establish a 7(a) exemption).

**\*8** Contrary to Treasury's arguments otherwise, the Ninth Circuit's holding in *Lion Raisins* regarding the type of showing necessary under 7(A) comports with FOIA law generally, and also with the 1986 amendments to FOIA (which the court notes *preceded* the court's decision in *Lion Raisins* ). A leading treatise recognizes that:

Analysis under the 1986 amendments may proceed in two parts. While there is an active proceeding, the exemption will apply, but courts will have to apply a two-step test of finding a proceeding which investigated a particular target and then deciding if it is reasonable to believe that interference could occur. The affidavit should show *either a concrete proceeding or one which is legitimately in prospect.* A concrete prospective law enforcement proceeding must be established by the agency. There must be a reasonable chance of an enforcement proceeding.

James T. O'Reilly, Federal Information Disclosure § 17:18, Burdens of Proof (2000 ed.); *see also id.* at § 17:141 (June 2008 suppl.) (citing *Lion Rais-*

*ins* regarding detail required with respect to agency's factual showing).

Had Treasury indeed properly categorized all of the delisting petitions in this case, which the court has concluded that it did not, it is true that it would not have been necessary for Treasury to make the detailed showing set forth in *Lion Raisins* with respect to *each individual delisting petition. See* Lewis, 823 F.2d at 380 (discussing *Robbins Tire,* 437 U.S. at 224-25); Bevis, 801 F.2d at 1389-90. However, Treasury was still required, at a minimum, to make the type of particularized showing set forth by the Ninth Circuit in *Lewis* and in *Lion Raisins* with respect to any appropriate *category* of documents. Even if the court were to assume that the delisting petitions were properly categorized in this case, it finds that Treasury has nevertheless failed to make a sufficient showing that the category, e.g., the delisting petitions, are covered by Exemption 7(A).

Much like portions of its second summary judgment motion, the court finds Treasury's position regarding 7(A) ambiguous and inconsistent. Treasury has failed to clarify whether it seeks to apply the exemption categorically or simply on a petition-by-petition basis to the nine delisting petitions set forth in the Vaughn index. Unlike 7(F), Treasury's Vaughn index confirms that 7(A) applies to only a few petitions. Nevertheless, without specifying whether it seeks categorical application of 7(A) to petitions *in this case,* in its brief, Treasury generally reiterates that the exemption may be applied on a categorical basis. Brief at 5. Either way, Treasury's claim of exemption fails.

Unlike Exemption 7(F), Treasury has again failed to make any showing, let alone a particularized one, that 7(A) should apply categorically. It has not defined a functional category of documents; nor has it provided any details regarding the proceedings with which release of the information will interfere. In fact, comparison of Treasury's prior Canter declaration with the Fields declaration confirms that, if anything, Treasury's showing regarding 7(A) has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

diminished.

**\*9** Previously, the court found the Fifth Canter Declaration insufficient. That declaration provided:

49. .... Release of these Delisting Petitions could have a chilling effect on the willingness of designated persons, witnesses, and other sources to provide the reliable, detailed information that is crucial to OFAC's consideration of a Delisting Petition. Additionally, the investigation processes used with respect to a delisting determination are in some cases similar to those used for a designation. Disclosing a Delisting Petition prior to completion of OFAC's review could reveal the direction of the investigation and could result in tampering with witnesses or other informational sources relevant to the inquiry.

50. OFAC determined that release of the Delisting Petitions, whether pending or concluded, would jeopardize the pending investigation and/or any future investigations or prosecutive efforts that have already begun or are anticipated. Once a release is made to a party under the FOIA, his or her use and dissemination of the information to third parties is unrestricted. OFAC also determined that release of these Delisting Petitions that were concluded would jeopardize other pending investigations of related persons or entities and any future investigations or prosecutive efforts that have already begun or are anticipated. OFAC's designation and delisting processes necessarily involve the investigation of networks of individuals and entities (i.e., familial or business networks) that are closely related. OFAC's ability to investigate one individual and/or entity and its relationship to a larger network is a key tool of its sanctions programs. For these reasons, OFAC determined that each Delisting Petition, whether pending or concluded, should be withheld in full under Exemption 7(A).

The current Fields declaration is even less helpful.

It provides in pertinent part:

30. OFAC asserted Exemption 7(A) and other exemptions to withhold information from nine delisting petitions that are related to an open and pending investigation where releasing the petitioner's name and other identifying information could reasonably be expected to interfere with such investigations or OFAC's reconsideration process....

....

32. In assertion Exemption 7(A) [sic] to redact the petitioner's name or other identifying information from these Delisting Petitions, OFAC determined that release of such information would jeopardize the pending investigation, any investigation of a related individual or entity that is pending, or any future investigations or prosecutive efforts that are anticipated, or OFAC's reconsideration process....

The court finds that Treasury has failed to demonstrate that Exemption 7(A) applies categorically to petitioners' identities and other identifying information. Moreover, with the exception of one petition, Vaughn index no. 29, which on its face indicates the presence of an investigation, the court also finds that Treasury has failed to make a sufficient showing with respect to the remaining eight delisting petitions for which it has individually asserted this exemption. As was the case previously, Treasury did not bother to translate into English for the court three of the petitions-Vaughn index nos. 155, 158, and 160, so the court is unable to make a determination as to those petitions; and Treasury has therefore failed to satisfy its burden with respect to those petitions. The remaining five petitions do not on their faces provide sufficient information regarding an ongoing or pending investigation.

**\*10** Nor has Treasury explained how the eight individual petitions satisfy this exemption in the Fields declaration or in its Vaughn index. *See* Fields Decl. ¶ 30. This is in spite of the court's explanation re-

Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984
**(Cite as: 2009 WL 1299821 (N.D.Cal.))**

garding the inadequacies in the prior Canter declaration. The court specifically noted in its September 30, 2008 order that:

The declaration does not enable the court to conclude that disclosure of the delisting petitions could reasonably interfere with a pending law enforcement action. Specifically, the declaration does not explain *how* disclosure of the petitions is likely to jeopardize other pending proceedings. It also fails to describe the harm that would allegedly result from third parties' possession of the information in the petitions. Significantly, the potential "chilling effect" and related consequences that Treasury asserts might result from disclosure are also speculative and unsupported by an adequate explanation or rationale. *See, e.g., City of Chicago v. United States Dept. of Treasury,* 287 F.3d 628, 634 (7th Cir.2002), *opinion amended on other grounds,* 297 F.3d 672 (7th Cir.2002) (rejecting agency's claimed exemption under 7(A) where potential for interference with law enforcement action was merely speculative). In sum, the conclusory, unsupported statements will not suffice to make the requisite showing, as set forth in *Lewis* and *Lion Raisins.* Because the Fifth Canter Declaration does not provide the court with sufficient detail to make an independent assessment of the government's claim of exemption, and for all of the above reasons, Treasury's motion for summary judgment as to Exemption 7(A) is DENIED.

Nothing has changed since the September 30, 2008 order, and, with the exception of the petition listed as Vaughn index no. 29, the court DENIES Treasury's claim that Exemption 7(A) should apply categorically to the delisting petitions, and further DENIES its claim that the exemption applies to eight of the nine individual petitions, Vaughn index nos. 43, 55, 82, 108, 140, 155, 158, and 160, for which it was asserted. If 7(A) was the only exemption currently at issue, the court would order that Treasury disclose unredacted versions of those eight petitions. However, the court notes that with

respect to all eight of those petitions, Treasury has also asserted Exemption 7(F), for which the court has GRANTED the very redactions it also requests under 7(A).

Given that Treasury has been provided with numerous opportunities to develop and litigate its claim of exemption under 7(A) in the course of this case-six declarations and a Vaughn index-the court DENIES any claim of exemption under 7(A). **Treasury will not be permitted to redact or withhold any further information or petitions under 7(A), and the court will not revisit or address any more claimed exemptions under 7(A).**

## CONCLUSION

The court GRANTS Treasury's request to categorically redact under Exemption 7(F) the identities and other identifying information of petitioners who were designated pursuant to OFAC's narcotics trafficking program or who cooperated or provided sensitive information to the U.S. government. With the exception of the petition listed as Vaughn index no. 29, the court DENIES Treasury's claim that Exemption 7(A) should apply categorically to the delisting petitions, and further DENIES its claim that the exemption applies to eight of the nine individual petitions, Vaughn index nos. 43, 55, 82, 108, 140, 155, 158, and 160, for which it was asserted.

**\*11** The court further concludes that Treasury is required to disclose the questionnaires and any responses to the questionnaires as responsive to LCCR's FOIA requests nos. 5 and 6.

**IT IS SO ORDERED.**

N.D.Cal.,2009.
Lawyers Committee for Civil Rights of San Francisco Bay Area v. U.S. Dept. of Treasury
Slip Copy, 2009 WL 1299821 (N.D.Cal.), 37 Media L. Rep. 1984

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
**(Cite as: 2006 WL 3490790 (D.D.C.))**

H

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
James OWENS, et al., Plaintiffs,
v.
UNITED STATES DEPARTMENT OF JUSTICE,
et al., Defendants.
**Civil Action No. 04-1701 (JDB).**

Dec. 1, 2006.

Steven R. Perles, Perles Law Firm, P.C., Thomas
Fortune Fay, Washington, DC, for Plaintiffs.

Elisabeth Layton, U.S. Department of Justice,
Washington, DC, for Defendants.

### MEMORANDUM OPINION

JOHN D. BATES, District Judge.

**\*1** This is a suit under the Freedom of Information
Act ("FOIA") filed by the plaintiffs in Civ. A. No.
01-2244(JDB), who are victims and relatives of
victims of terrorist attacks perpetrated against two
United States embassies in Africa in 1998. These
plaintiffs sought, both via a motion to compel in
their civil suit and via a separate FOIA request,
documentary materials that the Federal Bureau of
Investigation ("FBI") and other government agen-
cies (collectively "defendants") had compiled dur-
ing the investigation of the terrorist attacks and that
would have been subject to discovery in the crimin-
al prosecution of terrorist suspects in the Southern
District of New York. This Court denied plaintiffs'
motion to compel on May 4, 2004. *Owens v. Re-
public of Sudan,* Civ. A. No. 01-2244, dkt. # 77
(Order). The next day, the FBI denied their FOIA
request. Plaintiffs' challenge to the FBI's action was
assigned to this Court as a related case pursuant to
Local Civ. R. 40.5(c). Presently before the Court

are the parties' cross-motions for summary judg-
ment. For the reasons that follow, the Court will de-
fer resolution of both motions and order defendants
to file supplemental materials in accordance with
this opinion.

### BACKGROUND

The facts underlying plaintiffs' claims in Civ. A.
No. 01-2244, *Owens v. Republic of Sudan,* are fully
described in this Court's opinions reported at 412
F.Supp.2d 99, 102-03 (D.D.C.2006), and 374
F.Supp.2d 1, 4-7 (D.D.C.2005), and will not be re-
peated here. This section will instead be limited to
presenting the factual and procedural background
of plaintiffs' FOIA request.FN1 In order to establish
the liability of the foreign state defendants in their
civil suit, plaintiffs intend to show that the tech-
nique and materials used by the terrorists in the
Tanzania and Kenya bombings were the same ones
developed by Iranian agents in the 1980's and used
to attack a U.S. Marine Corps barracks in Beirut,
Lebanon in 1983. Compl. ¶¶ 3, 9; Pls.' Exh. B
(1/12/2004 Letter). On November 13, 2003,
plaintiffs filed a FOIA request accompanied by a
subpoena. Compl. at ¶ 4; Pls.' Exh. A. The request
sought "items already provided by the United States
in the course of discovery, or subject to discovery,"
in the criminal prosecution of suspected terrorists in
federal court in New York. *Id.* Plaintiffs requested
the following materials:

> FN1. As defendants correctly point out in
> their Reply Brief, plaintiffs have failed to
> comply with Local Civ. R. 7(h) and 56.1,
> which require that all motions for summary
> judgment "be accompanied by a statement
> of material facts as to which the moving
> party contends there is no genuine issue."
> These rules also oblige a party opposing a
> motion for summary judgment to file "a
> separate concise statement of genuine is-
> sues setting forth all material facts as to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
**(Cite as: 2006 WL 3490790 (D.D.C.))**

which it is contended there exists a genuine issue necessary to be litigated." Plaintiffs have not filed the required statements either in opposition to defendants' motion or in support of their own. Accordingly, the Court will treat the facts set forth in defendants' motion ("Defs.' Stmt.") as admitted. *See, e.g., Securities and Exch. Comm'n v. Banner Fund Int'l,* 211 F.3d 602, 616 (D.C.Cir.2000); *Argueta v. District of Columbia,* 355 F.Supp.2d 408, 413 (D.D.C.2005).

- Any and all FD-302s regarding the conduct of the physical crime scene searches of each of the Kenya and Tanzania Embassy bombing sites.

- Any and all photographs [including from all responding Evidence Response Teams (ERTs) ] of each of the Kenya and Tanzania Embassy bombing sites.

- Any and all activity and investigative logs, including sketches, created by both the ERTs and Bomb Technicians of each of the Kenya and Tanzania Embassy bombing sites.

- Any and all Evidence Logs and/or Inventory Logs of each of the Kenya and Tanzania Embassy bombing sites.

**\*2** - Any and all Laboratory Reports, and ancillary photographs, taken each of the bombing sites and during forensic laboratory analysis of evidence and reports of forensic results of examination taken from each of the Kenya and Tanzania Bombings.

- Any and all interviews of individuals during the on-site investigations and physical crime scene searches of each Kenya and Tanzania Embassy bombing sites.

- Any and all pertinent information taken from any search and seizure taken from Wadi El Hage's computer while living in Dar el Salam or Nairobi.

*Id.;* Defs.' Stmt. ¶ 1. A document attached to the subpoena and the FOIA request also indicated that the requested items were "further identified in FBI files under file references 'Tanbom' and 'Kenbom.' " Pls.' Exh. A (Attachment). The FBI acknowledged receipt of the FOIA request on December 17, 2003. Defs.' Stmt. ¶ 2.

In response to the FBI's concerns about dissemination of the requested materials, plaintiffs' counsel sent a letter, along with a copy of the amended complaint in Civ. A. No. 01-2244, explaining the use to which plaintiffs would put the materials. Defs.' Exh. 1, Part B (1/12/2004 Letter). Plaintiffs' January 12 submission also included privacy waivers and certifications-of-identity forms signed by many of the plaintiffs. Counsel's letter assured the FBI that the information obtained would not "be spread upon the public record," but would instead be provided only to two retired FBI agents who plaintiffs had hired as experts and to the Court for *in camera* review. *Id.* Those two agents, counsel noted, "held top security clearances at the time of their retirements." *Id.* Plaintiffs pressed a similar point the following month in their motion to compel production of the requested documents. *Owens v. Republic of Sudan,* Civ. A. No. 01-2244, dkt. # 41 (D.D.C. Feb. 3, 2004). The Court denied their motion on May 4, 2004, ruling that plaintiffs had not demonstrated their compliance with the regulations under which the FBI requires a requesting party to provide certain information before a third-party subpoena is honored. *Id.* dkt. # 77 (Order).

Just one day after this Court denied plaintiffs' motion to compel, the FBI denied their FOIA request. Defs.' Exh. 1, Part D (5/5/2004 Letter). The letter of denial stated that the materials requested by plaintiffs were "located in an investigative file which is exempt from disclosure pursuant to [5 U.S.C. § 552](b)(7)," *id.,* a provision that allows agencies to withhold "records and information compiled for law enforcement purposes" where, among other things, the release of those records "could reasonably be expected to interfere with enforce-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
**(Cite as: 2006 WL 3490790 (D.D.C.))**

ment proceedings." 5 U.S.C. § 552(b)(7)(A). At the same time, the FBI reserved the right to invoke additional statutory exemptions if the investigative file was again reviewed under FOIA or the Privacy Act. Defs.' Exh. 1, Part D; Defs.' Stmt. ¶ 4. The letter also informed plaintiffs of their right to an administrative appeal, which they promptly filed. Defs.' Exh. 1, Part E. Their appeal was denied on September 28, 2004. Defs.' Exh. 1, Part G (9/28/2004 Letter). Shortly thereafter, on October 5, 2004, plaintiffs filed the present suit seeking judicial review of the FBI's decision.

**\*3** After plaintiffs filed suit, the FBI sent plaintiffs' counsel another letter, dated May 26, 2005, in which it explained that it had reviewed 667 pages of material and had decided to release 638 pages of that material. Defs.' Exh. 1, Part H (5/26/2005 Letter). Those pages, as plaintiffs derisively though accurately describe them, were "blank except for the page number." Pls.' Opp'n at 1. In support of the almost complete redactions, the FBI continued to rely primarily on Exemption 7(A), but also invoked Exemptions 1, 2, 6, 7(C), 7(D), and 7(E) of FOIA. Defs.' Stmt. ¶ 10. Those exemptions form the basis for defendants' motion for summary judgment. In preparing that motion, however, the FBI determined that 447 of the 667 pages previously processed required a referral to other agencies. Defs.' Stmt. ¶ 12. Accordingly, 134 pages were referred to the Department of State, 44 pages to the Air Force, and 269 pages to the Central Intelligence Agency ("CIA"). *Id.* As a result, defendants' motion for summary judgment includes declarations from knowledgeable officials from all four of those agencies, as well as a *Vaughn* index provided by the CIA.[FN2] *Id.*

> **FN2.** Accompanying defendants' motion for summary judgment are sworn declarations from officials at the FBI ("Hardy Decl."), the Department of State ("Grafeld Decl."), the Air Force ("Pope Decl."), and the CIA ("Dorn Decl."). In addition, the FBI has provided 220 redacted pages that

are each annotated with the statutory exemptions claimed (Defs.' Exh. 1, Part I), and the CIA has submitted a *Vaughn* index along with the Dorn Declaration (Defs.' Exh. 4, Part A).

Plaintiffs have countered with a single eighteen-page document opposing defendants' motion and serving as their memorandum in support of summary judgment ("Pls.' Opp 'n"). Although plaintiffs' memorandum itself requests only that the Court conduct an *in camera* review of the over 600 pages identified by defendants as responsive to the FOIA request, the later-filed cross-motion for summary judgment clarifies that plaintiffs want the Court to order "*in camera* inspection of the items requested by Plaintiffs pursuant to the Freedom Of Information Act and upon inspection [to] Order production of those items, subject to redactions as the Court deems appropriate." Pls.' Motion at 1.

### DISCUSSION

**A. Legal Framework**

Congress enacted FOIA for the purpose of introducing transparency to government activities. *See Stern v. FBI,* 737 F.2d 84, 88 (D.C.Cir.1984). Reflecting Congress's awareness of the need to achieve balance between this objective and the vulnerability of "legitimate governmental and private interests [that] could be harmed by release of certain types of information," *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 872 (D.C.Cir.1992), FOIA provides for nine exemptions pursuant to which an agency may withhold requested information. *See* 5 U.S.C. §§ 552(b)(1)-(9). While they should generally be construed narrowly, *see Dep't of the Air Force v. Rose,* 425 U.S. 352, 361 (1976), these exemptions must be given the "meaningful reach and application" that Congress intended for them. *See John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 152 (1989). District courts review *de novo* an agency's

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
**(Cite as: 2006 WL 3490790 (D.D.C.))**

determination that requested information is statutorily exempt from disclosure. *Beck v. Dep't of Justice,* 997 F.2d 1489, 1491 (D.C.Cir.1993); 5 U.S.C. § 552(a)(4)(B).

**\*4** The defendant government agency bears the burden of demonstrating that the requested materials have been properly withheld. *U.S. Dep't of State v. Ray,* 502 U.S. 164, 174 (1991). Agency defendants can normally meet this burden by submitting "affidavits describing the material withheld and the manner in which it falls within the exemption claimed." *King v. Dep't of Justice,* 830 F .2d 210, 217 (D.C.Cir.1987). So long as the agency affidavits contain sufficient detail to establish "a logical connection between the information and the claimed exemption," the Court must "accord those affidavits substantial weight" and "consider[ ] the agency's unique insights into what adverse [e]ffects might occur as a result of public disclosure." *Goldberg v. U.S. Dep't of State,* 818 F.2d 71, 78 (D.C.Cir.1987) (internal citations and quotation marks omitted) (second alteration in original). The agency will have met its burden-and will thus be entitled to summary judgment-where (1) its "affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed, and (2) the affidavits are neither controverted by contrary record evidence nor impugned by bad faith on the part of the agency." *King,* 830 F.2d at 217. For the requester to have "a realistic opportunity to challenge the agency's decision" to refuse disclosure, the agency must provide a description and explanation that "reveal[s] as much as possible as to the nature of the document[s], without actually disclosing information that deserves protection." *Oglesby v. U.S. Dep't of the Army,* 79 F.3d 1172, 1176 (D.C.Cir.1996).

Although agencies often provide (and courts sometimes require) a formal *Vaughn* index,[FN3] the D.C. Circuit has repeatedly held that "it is the function, not the form, of the index that is important." *Keys v. U.S. Dep't of Justice,* 830 F.2d 337, 349 (D.C.Cir.1987); *see also Judicial Watch, Inc. v. Food & Drug Admin .,* 449 F.3d 141, 146 (D.C.Cir.2006) (citing *Keys* and emphasizing that the focus is on "the functions of the *Vaughn* index, not the length of the document descriptions"). As the court of appeals recently reaffirmed, an agency defendant can meet its burden by "submit[ting] other measures in combination with or in lieu of the index itself," including affidavits from responsible agency officials. *Id.* Courts in this circuit have accordingly found sufficient to support a grant of summary judgment agency affidavits in conjunction with copies of redacted pages annotated with codes that allow the court and the requester to identify the pertinent FOIA exemptions and the type of information withheld under each exemption. *See, e.g., Keys,* 830 F.2d at 349; *Taylor v. U .S Dep't of Justice,* 257 F.Supp.2d 101, 106 (D.D.C.2003). Those submissions constitute an adequate substitute for "the classical *Vaughn* index" if they "efficiently and clearly" accomplish the functions performed by such an index: they force the government to analyze carefully the material withheld, permit the trial court to rule on the applicability of the exemption, and provide the requester as much information as possible, thus facilitating the adversarial process. *See Keys,* 830 F.2d at 349 (citing *Lykins v. Dep't of Justice,* 725 F.2d 1455, 1463 (D.C.Cir.1984)). The threshold question here is thus whether the combination of materials submitted by defendants satisfies the objectives of a *Vaughn* index and permits the Court to determine the applicability of the array of exemptions that defendants have invoked.

FN3. A *Vaughn* index is a description of records, or portions of records, withheld by the agency in response to a FOIA request, along with an explanation of the reason for the agency's nondisclosure. *See Vaughn v. Rosen,* 484 F.2d 820, 827 (D.C.Cir.1973).

**B. Exemption 7(A)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
(Cite as: 2006 WL 3490790 (D.D.C.))

**\*5** In their motion for summary judgment, defendants invoke many of the nine statutory exemptions set forth in FOIA, 5 U.S.C. § 552(b). Defendants' primary basis for releasing the requested materials in completely redacted form, however, is their assertion that the materials were compiled for law enforcement purposes and that disclosure of the materials could reasonably be expected to interfere with the still open investigation into the Tanzania and Kenya bombings. As such, defendants maintain, all of the requested materials are exempt from disclosure under 5 U.S.C. § 552(b)(7)(A), which allows agencies to withhold "records or information compiled for law enforcement purposes ... to the extent that the production of such law enforcement records or information [ ] could reasonably be expected to interfere with enforcement proceedings." Defendants also argue that, if the Court rejects their invocation of Exemption 7(A) in whole or part, the requested materials were properly withheld under various other statutory exemptions.

To demonstrate that requested records are exempt from disclosure under § 552(b)(7)(A), defendants must show (1) that the records were compiled for law enforcement purposes, and (2) that release of the records could reasonably be expected to interfere with a concrete, prospective law enforcement proceeding. *See Bevis v. Dep't of State*, 801 F.2d 1386, 1388-89 (D.C.Cir.1986) (citing *Carson v. U.S. Dep't of Justice*, 631 F.2d 1008, 1018 (D.C.Cir.1980)). "A record is deemed to have been compiled for [law enforcement purposes] if it was created or acquired in the course of an investigation 'related to the enforcement of federal laws,' and 'the nexus between the investigation [is] and one of the agency's law enforcement duties [is] based on information sufficient to support at least a colorable claim of its rationality.' " *Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1228 (D.C.Cir.1996) (quoting *Pratt v. Webster*, 673 F.2d 408, 420-21 (D.C.Cir.1982) (internal quotation marks omitted)). Defendants assert, and plaintiffs do not dispute, that this threshold showing has been made in the present case, since the requested records were generated during an investigation into terrorist attacks against the United States and the defendant agencies are statutorily authorized to investigate activities of this type. *See* Hardy Decl. ¶ 80 (citing 18 U.S.C. § 2331 ); Grafeld Decl. ¶ 23 (citing 22 U.S.C. §§ 2709, 4802). Plaintiffs do challenge, however, defendants' contentions that the open investigation constitutes a concrete, prospective law enforcement proceeding and that release of the requested documents could reasonably be expected to interfere with such a proceeding.

In attempting to establish such interference, defendants "need not proceed on a document-by-document basis, detailing to the court the interference that would result from the disclosure of each of them." *Bevis,* 801 F.2d at 1389. They may instead "take a generic approach, grouping documents into relevant categories that are 'sufficiently distinct to grasp how each ... category of documents, if disclosed, would interfere with the investigation.' " *Id.* (quoting *Crooker v. Bureau of Alcohol, Tobacco, and Firearms,* 789 F.2d 64, 76 (D.C.Cir.1986)) (internal citation omitted). "The hallmark of an acceptable" category, the *Crooker* court explained, is that it is "functional" in that it permits a reviewing court "to trace a rational link between the nature of the document and the alleged likely interference." 789 F .2d at 76. Based on these principles, the D.C. Circuit in *Bevis* announced a three-fold task that must be completed by an agency "wish[ing] to adopt the generic approach" to justify withholding records under Exemption 7(A). The agency must (1) define its categories functionally, (2) conduct a document-by-document review in order to assign documents to the proper category, and (3) explain to the court how the release of each category would interfere with enforcement proceedings. *Bevis,* 801 F.2d at 1389-90. According to the FBI, this is precisely the procedure that was followed in response to plaintiffs' FOIA request. Hardy Decl. ¶ 82.

**\*6** Defendants' attempt to satisfy their burden under Exemption 7(A) is found principally in seven para-

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
**(Cite as: 2006 WL 3490790 (D.D.C.))**

graphs of the declaration of David M. Hardy, the official in charge of FOIA and Privacy Act compliance at the FBI. *See* Hardy Decl. ¶¶ 82-88. Hardy divided the materials responsive to plaintiffs' FOIA request into seven categories, each of which he describes in no less than a sentence but no more than a brief paragraph. The categories are: (a) Electronic Communication; (b) Teletype; (c) Message Re-Addressal Forms; (d) Memorandum; (e) FBI Routing/Action Slip; (f) Work Product Canvas Forms; (g) Third-Party Communications. *Id.* ¶ 83. These generic categories, notwithstanding the brief explanations provided, do not allow "the [C]ourt to trace a rational link between the nature of the document and the alleged likely interference." *See Crooker,* 789 F.2d at 76. Indeed, one of the categories-teletype-is identical to a category that the D.C. Circuit in *Bevis* condemned as "giv [ing] absolutely no indication of the substance of the information contained" within the investigative file. 801 F.2d at 1390.FN4 Five of the remaining six categories, the exception being the one labeled "Third-Party Communications," similarly fail to indicate to any degree what type of information those particular records contain. Stated succinctly, all but one of the categories identify various methods of transmittal without providing so much as a bare sketch of the type of information being transmitted. Accordingly, the categories do not permit the Court to assess the likelihood that release of the requested information would interfere with a pending or prospective enforcement proceeding. Defendants have thus failed to complete the "three-fold task" set forth in *Bevis. See id.* at 1289.

> FN4. The D.C. Circuit in *Bevis* held that categories such as "the identities of possible witnesses and informants," "reports on the location and viability of potential evidence," and "polygraph reports" satisfied the "functionalism requirement because they allow[ed] the court to assess the FBI's representations of how release of the documents would result in interference to the [prospective] proceedings." 801 F.2d at

1390. In contrast, categories labeled "teletypes," "airtels," and "letters" established "no basis for a judicial assessment of the FBI's assertions that release of the documents so categorized would interfere with enforcement proceedings." *Id.* As is evident from their titles, these latter categories are directly analogous to six of the seven categories formulated in the Hardy Declaration.

In reaching this conclusion, the Court recognizes that defendants are walking a fine line and that courts reviewing the withholding of agency records under Exemption 7 cannot demand categories "so distinct as prematurely to let the cat out of the investigative bag." *See Curran v. Dep't of Justice,* 813 F.2d 473, 475 (1st Cir.1987). Nevertheless, in order for the Court to adjudicate responsibly a plausible claim that large numbers of significant documents are exempt from disclosure under FOIA, defendants must come forward with affidavits and/or other materials that "demonstrate specifically how each ... category of documents, if disclosed, would interfere with the investigation." *Campbell v. Dep't of Health and Human Servs.,* 682 F.2d 256, 265 (D.C.Cir.1982). Although they may well be able to make this showing with only modest modifications to their submissions, defendants have not yet done so. The Court therefore concludes, based strictly on the record before it, that defendants are not entitled to summary judgment under Exemption 7(A) at this time.

The question then becomes whether the Court should deny this aspect of defendants' motion without prejudice and proceed to address defendants' alternative arguments for withholding the requested documents. The Court answers that question in the negative, both because the D.C. Circuit's decision in *Bevis* suggests a different course and because that course best serves the virtues of efficiency and judicial economy. After concluding that at least three of the categories employed by the agency defendants did not entitle those defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
**(Cite as: 2006 WL 3490790 (D.D.C.))**

to summary judgment, the *Bevis* court remanded the case "to the district court for a more specific inquiry into the nature of the withheld documents." 801 F.2d at 1390. The district court was instructed on remand to "direct the FBI to reformulate its generic categories in accordance with the *Crooker* requirement and then to conduct an item-by-item review in order to assign documents to the appropriate category." *Id.* In addition, the D.C. Circuit advised the district court to "instruct the FBI to submit affidavits confirming compliance with these requirements and describing how the release of each category of documents would interfere with the [prospective enforcement] proceedings." *Id.* Given the similarity of the categories used in the Hardy Declaration to those considered in *Bevis,* defendants need to submit additional materials of the same nature and scope as the ones required in that case for this Court to evaluate their claims under Exemption 7(A).

**\*7** To be sure, the D.C. Circuit in *Bevis* did not address the precise situation in the present case, where agency defendants have invoked a host of other exemptions in addition to Exemption 7(A). Indeed, the district court in one of the two cases consolidated before the court of appeals had adjudicated the FBI's claim that a smaller number of records were also exempt under § 552(b)(1), *Bevis v. Dep't of State,* 575 F.Supp. 1253, 1254-56 (D.D.C.1983), and the D.C. Circuit did not pass upon that issue. This Court nonetheless concludes that the remand ordered by, and the instructions prescribed by, the D.C. Circuit in *Bevis* are warranted in the present circumstances. For one thing, Exemption 7(A) is the only statutory exemption that defendants have invoked with respect to *all* of the pages deemed responsive to plaintiffs' FOIA request. It is also the sole exemption on which the FBI has relied since the administrative proceedings. (Defendants candidly acknowledge that they have proffered the remaining grounds for withholding the documents only to avoid waiving those grounds under the D.C. Circuit's decision in *Maydak v. U.S. Dep't of Justice,* 218 F.3d 760, 766 (D.C.Cir.2000)

.) *See* Defs.' Motion at 5.

Furthermore, the Court finds that a limited remand at this stage likely represents the most expeditious- and least burdensome-manner of resolving this case. Most significantly, defendants' submissions, though far from crystal clear on the point, reveal that Exemption 7(A) is the only ground proffered for withholding at least some of the documents. *See, e.g.,* Grafeld Decl. ¶ 4 (pointing to documents marked F1 and F5 as ones for which the State "Department has not identified any additional exemptions" beyond Exemption 7(A)). The applicability of Exemption 7(A) therefore cannot be avoided even if the case is assessed on the alternative grounds offered in defendants' motion. Resolving the case on those alternative grounds, moreover, would require the Court to wade through sworn declarations from three other agencies and a thirty-eight document *Vaughn* index provided by the CIA, and to consider sensitive claims related to foreign policy and national security, as well as less lofty questions like whether the model number of secure data devices is exempt from disclosure under § 552(b)(2). And with respect to questions both complex and mundane, the Court cannot help noting that plaintiffs' at times dismissive responses to defendants' arguments have not appreciably aided, and to some degree have hampered, the Court's ability to conduct a *de novo* review of defendants' decision to resist disclosure. There is no reason for this case to be decided based on challenges made in a curt or flippant manner, especially when deferring decision until after a *Bevis*-style remand will cause only a minor delay and could very well flesh out the aforementioned weaknesses in the adversarial process up to this point. Accordingly, the Court will enter an order that (1) requires defendants to submit additional materials on the Exemption 7(A) claims in accordance with *Bevis* and this Memorandum Opinion and (2) provides plaintiffs with an opportunity to respond to those materials and defendants' arguments in support thereof.

**\*8** Finally, the Court declines, at least for the time

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)
**(Cite as: 2006 WL 3490790 (D.D.C.))**

being, plaintiffs' request for *in camera* review of the 600 plus pages deemed responsive to their FOIA request. Whether to conduct *in camera* review rests squarely within the discretion of the district court. *See Spirko v. U.S. Postal Serv.,* 147 F.3d 992, 996 (D.C.Cir.1998). The D.C. Circuit has consistently stated, however, that because this form of review is to some extent antithetical to the nature of the adversary system, it is to be used as a "last resort." *See, e.g., Hayden v. Cent. Intelligence Agency,* 608 F .2d 1381, 1387 (D.C.Cir.1979); *see also Quiñon,* 86 F.3d at 1228 (explaining that "an *in camera* review should not be resorted to as a matter of course, simply on the theory that 'it can't hurt.' ") (citation omitted). Here, the so-called *Allen* factors enunciated by the D.C. Circuit, *see Allen v. Cent. Intelligence Agency,* 636 F.2d 1287, 1298 (D.C.Cir.1980); *Carter v. U.S. Dep't of Commerce,* 830 F.2d 388, 392 (D.C.Cir.1987), weigh against *in camera* review. While the Court has found that defendants' explanation with respect to Exemption 7(A) does not, in its current form, suffice to grant summary judgment, there is no evidence of agency bad faith, and the documents at issue are numerous, rather than "few in number and of short length." *See Allen,* 636 F.2d at 1298; *Carter,* 830 F.2d at 393. Hence, the Court cannot conclude at this time that " '*in camera* inspection is needed in order to make a responsible de novo determination on the claims of exemption.' " *See id.* at 392 (quoting *Ray v. Turner,* 587 F.2d 1187, 1195 (D.C.Cir.1978) (per curiam)). Plaintiffs remain free to reassert the need for *in camera* review in their response to the additional submissions forthcoming from defendants.

### CONCLUSION

For the foregoing reasons, the Court defers resolution of the parties' cross-motions for summary judgment and orders defendants to provide the materials described above in support of their argument that the documents requested by plaintiffs are exempt from disclosure under 5 U.S.C. § 552(b)(7)(A). A separate order has been posted on this date.

D.D.C.,2006.
Owens v. U.S. Dept. of Justice
Not Reported in F.Supp.2d, 2006 WL 3490790 (D.D.C.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 427286 (D.Mass.)
**(Cite as: 2008 WL 427286 (D.Mass.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
UNITED STATES of America,
v.
John M. CICILLINE, Joseph A. Bevilacqua, Jr.,
Juan Giraldo and Lisa Torres, Defendants.
**Criminal No. 07-10008-NMG.**

Feb. 13, 2008.

Richard M. Egbert, Law Office of Richard M.
Egbert, Boston, MA, for Defendants.

**MEMORANDUM & ORDER**

GORTON, J.

**\*1** In response to a motion to compel discovery of
internal United States Attorney's Office policies the
government has submitted certain material to this
Court for *in camera* review. Also before the Court
is the government's motion to revoke or modify the
terms of one defendant's pre-trial release.

**I.** *Background*

The defendants are charged in a four-count indict-
ment with obstruction of justice, false statements
and conspiracy. The government alleges that the
defendant Lisa Torres ("Torres") was a confidential
informant ("CI") for the United States Drug En-
forcement Agency ("DEA"). It alleges further that
Torres attempted to cooperate with the United
States Attorney's Office in Boston in a criminal in-
vestigation in order to induce it to seek "substantial
assistance" motions for the client of her co-
defendants who are criminal defense attorneys. The
government asserts that, in the course of their inter-
actions with the U.S. Attorney's Office, the defend-
ants deliberately misrepresented the relationship

between Torres and the client in order to induce the
government to file such a motion.

In order to defend against these charges, the de-
fendants propose to argue that any false statements
that they may have made were not material and that
therefore an essential element of the charged of-
fense cannot be proved. In essence, they contend
that if false statements were made, they had no im-
pact on the government's decision to file (or not to
file) a substantial assistance motion. In order to
prove the immateriality of the statements, they have
moved this Court to order the government to pro-
duce all policies with respect to the allowance of
"substantial assistance" credit for criminal defend-
ants on the basis of cooperation by third parties.

In a Memorandum and Order entered on January
17, 2008, this court allowed, in part, and denied, in
part, the defendants' motion to compel discovery.
Specifically, it ordered the government to produce
for *in camera* review any written policies that ex-
isted in 2004 governing the filing of so-called third
party substantial assistance motions. In accordance
with that Order the government, first, submitted a
description of the documents it discovered as a res-
ult of its search and, after a direction from the
Court to produce them in kind, the documents
themselves.

**II.** *Analysis*

**A. The** *In Camera* **Submission**

The government has produced for the Court's *in
camera* review three documents that refer tangen-
tially to its practices with respect to third-party co-
operation. Each is an internal memorandum com-
posed by an individual Assistant United States At-
torney and none purports to set final policy. The
government asserts, and the Court agrees, that the
documents do not constitute "policy" in the lan-
guage of this Court's January 17, 2008 Order and
are, in any event, protected by the deliberative pro-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 427286 (D.Mass.)
**(Cite as: 2008 WL 427286 (D.Mass.))**

cess privilege.

The deliberative process privilege protects documents that are both "predecisional" and "deliberative." *See Town of Norfolk v. U.S. Army Corps of Eng'rs.* (968 F.2d 1438, 1458 (1st Cir.1992). Briefly, a document is "predecisional" if it precedes in time the decision to which it was applied and it is "deliberative" if it constitutes a statement of opinion regarding final policy rather than a description of the ultimate policy itself. Because the documents produced do not set official policy, they are deliberative, and because they were considered in the course of third-party-cooperation decisions after they were written, they are predecisional. Therefore, the government's assertion of deliberative process privilege is well-founded. Communications such as these, by which individual employees of an executive agency contribute to the formation of policy, are precisely the kind of documents that the deliberative process privilege is intended to protect. *Id.* Only through the free exchange of opinions, unfettered by concern of exposure to outside parties, can such agencies operate effectively. The documents need not be produced for the defendants.

## B. Motion to Revoke or Amend Conditions of Release

**\*2** The terms of Cicilline's pretrial release allow him to travel within Massachusetts, Rhode Island and Connecticut without restriction and, with permission of Pretrial Services, to New York for court appearances. The government alleges that Cicilline has made several unauthorized trips to New Hampshire and to Maine in violation of his terms of release. It moves, therefore, to revoke or amend his conditions of release.

Cicilline's opposition avers that he was unaware of the fact that he was not permitted to travel to New Hampshire and Maine. He notes that there was no subterfuge in his trips and cites that fact as evidence of his good faith mistake. Now that he is aware of the limitations on his movements he

pledges to follow them, with apologies for his earlier inadvertent transgressions.

This Court accepts Cicilline's explanation but cautions him that any future violation of his conditions of release, which remain as previously imposed, will result in real sanctions.

## ORDER

In accordance with the foregoing, the government need not produce to the defendants any of the materials that it has submitted to the Court for *in camera* review. The government's motion to revoke or amend conditions of release (Docket No. 81) is **DENIED.**

**So ordered.**

D.Mass.,2008.
U.S. v. Cicilline
Not Reported in F.Supp.2d, 2008 WL 427286 (D.Mass.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.